IN THE MATTER OF THE REVISION OF RATES FILED BY
TOMS RIVER WATER COMPANY INCREASING ITS RATES
FOR WATER SERVICE.

TOMS RIVER WATER COMPANY, RESPONDENT, v. NEW
JERSEY BOARD OF PUBLIC UTILITY
COMMISSIONERS, APPELLANT.

Argued January 7, 1980—Decided March 11, 1980.

202

*Bertram P. Goltz, Jr.,* Deputy Attorney General, argued the cause for appellant (*John J. Degnan,* Attorney General of New Jersey, attorney; *Stephen Skillman,* Assistant Attorney General, of counsel).

*Alfred L. Nardelli,* Deputy Public Advocate, argued the cause for respondent Public Advocate (*Stanley C. Van Ness,* Public Advocate, attorney; *Anne S. Babineau,* Assistant Deputy Public Advocate, and *Alfred L. Nardelli,* on the briefs).

*William C. Davis* argued the cause for respondent Toms River Water Company (*Davis & Reberkenny,* attorneys; *John S. Fields* and *William D. Lavery, Jr.,* on the briefs).

The opinion of the Court was delivered by

PASHMAN, J.

Last Term, our decision in *In re Lambertville Water Co.,* 79 *N.J.* 449 (1979), raised but declined to resolve the issue whether the Board of Public Utility Commissioners (Board) may give retroactive effect to an approved increase in a utility's rates. See *id.* at 457. We now address that issue. A second, related question before us is whether a utility's application for a rate increase takes effect if the Board does not act upon it before the expiration of the suspension period for the proposed rates. We granted certification, 81 *N.J.* 270 (1979), to consider the effect of "regulatory lag"—the lapse of time while tariff proceedings are pending, see *State v. New Jersey Bell Tel. Co.,* 30 *N.J.* 16, 28 (1959)—upon the fair and efficient resolution of rate petitions.

Toms River Water Company (Water Company) is a New Jersey public utility corporation which provides water and fire protection services to designated areas of Ocean County, New Jersey. On April 1, 1975, it filed a petition with the Board for permission to raise the rates for its services effective May 7, 1975. Citing mainly spiraling costs and the need for a greater cash flow, Toms River Water sought a 40% increase in its rates.

On April 17, the Board ordered hearings on the proposed higher tariff and suspended its effect for four months until September 7, 1975. Although the Board had the authority to suspend the new rates for an additional four months, see *N.J.S.A.* 48:2–21(d), it did not issue a second order.

A hearing examiner conducted proceedings on the application for nine days between May 13 and July 29, 1975. During the hearings a witness for the Water Company attempted to persuade the examiner that the utility should receive some compensation specifically for "regulatory lag." Henry G. Mulle, an official with an affiliate of the Water Company, testified that an increase should be allowed in the percentage rate of fair and reasonable return to reflect the passage of time while the rate application was pending. According to Mr. Mulle, this adjustment was necessary because rising interest rates would make the cost of borrowing money higher at the conclusion of the proceedings than at the time of the application.

The Public Advocate, Berkeley Township, Dover Township and the Board of Fire Commissioners of Dover Township participated as objectors. After the hearings were completed, the Water Company, the Public Advocate and Berkeley Township filed briefs with the examiner. The utility filed a reply brief on October 9.

On December 30, 1975, the Board on its own motion extended the time for the examiner to submit his report and recommendations until January 28, 1976.[1] In an order dated February 26, 1976, the Board granted a further extension until March 15.

---

[1] The order noted that *N.J.A.C.* 14:1–12.3 obligated the examiner to submit a report by December 13, 1975. The rule itself requires a submission within 30 days after the completion of all steps in the proceedings before the examiner. Neither the record nor the Board's "Statement of Items comprising the Record," see *R.* 2:5–4(b), reveals what proceedings occurred after the Water Company filed its reply brief on October 9.

Both orders referred to the heavy workload of the examiner and the need for "an intelligent recommendation" based on sufficient review. Both extensions were unopposed.

The hearing examiner filed his report and recommendation on May 27, 1976. He concluded that the utility's application should be denied, but recommended that it be permitted to file a new proposal incorporating a smaller rate increase.[2] In his report, the examiner rejected the argument that the Water Company should receive compensation for "regulatory lag." He found that such a proposed adjustment "seeks protection against future increases in debt which have already been included to an extent reasonable in this case."

The Water Company, the Public Advocate and Berkeley Township filed exceptions to the report. The Water Company again claimed that its rate of return should receive an adjustment for "regulatory lag."

In its decision on September 13, 1976, the Board substantially adopted the findings and conclusions of the hearing examiner.[3] It rejected the Water Company's tariff proposal, but permitted the utility to file a revised schedule which would provide slightly more revenue than the examiner's recommendation. According to the Board's order, the new rates would "become effective for service rendered after [their] acceptance by the Board."

An initial revision submitted on October 1, 1976, did not conform with the Board's guidelines. After the Water Company

---

[2]According to the examiner, the utility's original proposal would have generated an annual operating income of "approximately $936,584," for a return of 11.97% on the "fair value rate base." The recommended increase would produce a total of $784,871 in operating income and a rate of return of 10.03%.

[3]The Board modified the examiner's revenue recommendation to reflect a change in the utility's treatment of depreciation for tax purposes. The Board adopted the examiner's report in all other respects.

amended the second proposal, the Board approved the new tariff as "effective for service rendered on and after the date of this Order"—November 10, 1976. The resolution of the Water Company's application took over nineteen months from the filing of the original petition.

While the utility's last proposal was still pending, it filed a notice of appeal to the Superior Court, Appellate Division, challenging two portions of the Board's September 13 order denying the initial petition. The first cause for appeal was the imputation of an improper amount of tax expense based on the utility's participation in a consolidated federal tax return. As stated in the notice of appeal, the second was the "[r]efusal of the Board to make the Petitioner's revised tariffs effective as of the date on which the Board was required by law to have made a determination * * *." This is the first time in the record before us that the utility sought this form of compensation for "regulatory lag." [4]

The Appellate Division reversed the Board on both challenged rulings. 158 *N.J.Super.* 57 (1978). Relying on its earlier opinion in *In re Lambertville Water Co.*, 153 *N.J.Super.* 24 (App.Div. 1977), rev'd in part, 79 *N.J.* 449 (1979), the court remanded the matter to the Board for redetermination of the Water Company's effective tax rate in accord with some express, rational formula. 158 *N.J.Super.* at 59–61; see *Lambertville Water Co.*, 153 *N.J.Super.* at 29, rev'd on other grounds, 79 *N.J.* 449, 401 A.2d 211 (1979).[5] The Appellate Division also reiterated its holding in *Lambertville Water Co.* that any increase ultimately

---

[4] The change in the Water Company's approach to "regulatory lag" may have been prompted by release of the Appellate Division's decision in *In re Lambertville Water Co.*, 153 *N.J.Super.* 24 (App.Div. 1977) (decided September 29, 1977). The utility's notice of appeal was filed on October 26, 1977.

[5] None of the parties has petitioned the Court to consider this issue; we therefore express no opinion on it. See *R.* 2:12–11; cf. *Lambertville Water Co.*, 79 *N.J.* at 453–454.

granted by the Board should apply to all service rendered after the end of the statutory suspension period.[6] 158 *N.J.Super.* at 61. The Board now seeks review of this latter ruling.

Our reversal of the Appellate Division in *Lambertville Water Co.* came after that court's decision in the present case. We must therefore begin our analysis with our earlier opinion. We held there that *N.J.S.A.* 48:2–21(d), which empowers the Board to suspend the effect of a proposed tariff for up to eight months,[7] "has no bearing on the effective date of a substituted rate increase fashioned by the Board when it rejects that sought by the utility." 79 *N.J.* at 455. We noted that the statutory suspension procedure applies only to the tariff actually proposed. We therefore held that the suspension provision does not limit the Board's "broad discretion to fix an effective date in the light of circumstances" for a substituted rate increase. *Id.* at 456.

█ In the present case, the Appellate Division held that *N.J.S.A.* 48:2–21(d) denied the Board any discretion to fix an

---

[6]Although the Board had issued only one suspension order for a period of four months, the Appellate Division held that the effective date of the Board's decision on remand should be calculated "by the expiration of the eight-month statutory suspension period (N.J.S.A. 48:2–21(d)) * * *," as if the Board had ordered a second suspension. 158 *N.J.Super.* at 61.

[7]That provision states in pertinent part:

(d) When any public utility shall increase any existing individual rates, joint rates, tolls, charges or schedules thereof, * * * the board, either upon written complaint or upon its own initiative, shall have power after hearing, upon notice by order in writing to determine whether the increase * * * is just and reasonable. * * * The board, pending such hearing and determination, may order the suspension of the increase * * * until the board shall have approved the same, not exceeding 4 months. If the hearing and determination shall not have been concluded within such 4 months the board may during such hearing and determination order a further suspension for an additional period not exceeding, 4 months. The board shall approve the increase * * * upon being satisfied that the same is just and reasonable.

effective date beyond the suspension period for a substituted tariff schedule. We have since rejected that view in *Lambertville Water Co.*; therefore, the decision of the Appellate Division must be reversed.

The Water Company concedes that our earlier ruling necessitates such a result. However, it urges us to consider the effects of our holding upon the interests of utilities and the public in the regulatory process. We noted in *Lambertville Water Co.* that the suspension provision of *N.J.S.A.* 48:2–21(d) may impliedly grant a utility the right to implement its proposed rate increase without approval if the Board fails to pass upon it within the eight-month suspension period. 79 *N.J.* at 456. We also raised the possibility that the Board may have discretionary authority to give retroactive effect to a substituted filing, although we reaffirmed that rate making must generally be prospective only. *Id.* at 457. Because neither issue was presented to this Court, we refrained from resolving them. See *id.* at 456, 457. However, the need for guidance to avoid protracted future litigation is now apparent. We therefore accept the invitation to clarify the procedures governing the disposition of tariff applications under the public utility law.

The principal provision describing the Board's authority over tariffs is *N.J.S.A.* 48:2–21. The statute grants the Board power to require all public utilities to file with it their rates and charges. *N.J.S.A.* 48:2–21(a); see *N.J.A.C.* 14:1–7.1 to –7.5. The Board may also "[f]ix just and reasonable individual rates, * * * charges or schedules thereof" on its own initiative, after a hearing with appropriate prior notice, *N.J.S.A.* 48:2–21(b)(1). Section 21 further empowers the Board to pass upon whether a proposed increase in rates or charges is "just and reasonable." *N.J.S.A.* 48:2–21(d); see *N.J.A.C.* 14:1–6.16. To invoke that authority, the Board "may order the suspension of the increase, change or alteration until the [B]oard shall have approved the same, not exceeding 4 months." *N.J.S.A.* 48:2–21(d). If more time is needed for a determination, the Board

may "order a further suspension for an additional period not exceeding, [sic] 4 months." *Id.*

Through regulations promulgated under legislative authority, see *N.J.S.A.* 48:2–12, the Board has established procedures for determining the propriety of an increase in rates. The utility's application must contain a statement of reasons and detailed financial data in support of the proposed change. *N.J.A.C.* 14:1–6.15(a)(2), –6.16(a) & (a)(1)–(6). It must also state the date on which the utility proposes to make the increase effective; that date must be at least 30 days after the filing. *N.J.A.C.* 14:1–6.15(a)(4), –6.16(a). This gives the Board a reasonable opportunity to exercise its statutory authority to suspend the effective date.

After the utility files its petition, the Board may order hearings on the application which must be open to the public. *N.J.S.A.* 48–2–21(d); *N.J.A.C.* 14:1–10.1, –10.2. The utility must provide prior notice of both its application and the date of any hearings to each municipal clerk within its service area, the Director of the Division of Rate Counsel, Department of the Public Advocate, and all affected customers. *N.J.A.C.* 14:1–6.-17(b)(1)–(3). Notice to customers must be given by bill insert or by publication in local newspapers. *N.J.A.C.* 14:1–6.17(b)(3); see *N.J.A.C.* 14:1–6.16(a)(7).

Hearings are held before the Board, one of its members or a designated administrative law judge. *N.J.A.C.* 14:1–10.3; see also *N.J.S.A.* 52:14F–5(n), –6(a).[8] At the hearings, persons opposing the utility's petition may state their positions under oath or affirmation and be subject to cross-examination. See *N.J.A.C.* 14:1–4.3. Such "objectors" are not considered "parties" to the proceedings unless the Board in its discretion grants them

---

[8]The Board regulations refer to "hearing examiners," but the office and functions of hearing examiners have been superseded by those of administrative law judges assigned to the Board and other state agencies by the Office of Administrative Law. See *N.J.S.A.* 52:14F–4 to –6 (effective January 6, 1979, see *L.*1978, *c.* 67, § 16).

leave to intervene. See *N.J.A.C.* 14:1–9.1 to –9.4. If an administrative law judge presides, he must file with the Board his report and recommendations within 30 days after all steps in the proceedings are completed. *N.J.A.C.* 14:1–12.3. Once the Board receives the report, it must affirmatively act to adopt, reject or modify the recommendations. See *N.J.A.C.* 14:1–12.10. These and other agency procedures appear designed to permit resolution of rate petitions as expeditiously as possible. See also *N.J.S.A.* 52:14B–10(a), (b) (relaxation of judicial rules of evidence); *N.J.A.C.* 14:1–11.1 to –11.4 (prehearing conferences to narrow disputed issues).

The Legislature has recently emphasized the public interest in the efficiency of the regulatory process. The 1978 amendments to the Administrative Procedure Act, *L.*1978, *c.* 67, while not applicable to this case, impose additional procedural requirements on the Board as well as other State agencies. The Board is now required to act upon the administrative law judge's report and recommendation within 45 days after receipt. *L.* 1978, *c.* 67, § 8, *N.J.S.A.* 52:14B–10(c). If the Board does not modify or reject the report during that period, it shall be deemed adopted as the Board's final decision. *Id.* Upon certification of good cause by the Director of the Office of Administrative Law and the Board's chairman, the 45-day limitation may be extended. *Id.*

The Legislature has provided the Board with specific remedies for the problem of "regulatory lag." One statute, *N.J.S.A.* 48:2–21.1, states that the Board may negotiate with the utility to establish interim rates while a tariff application is pending. However, such an agreement binds neither the Board nor the utility's customers: "[i]n no event shall any such adjustment be regarded as contractual." *Id.* Any temporary increase would be subject to rebate if the rates are found not to be "just and reasonable." *In re Intrastate Industrial Sand Rates*, 66 *N.J.* 12, 25 (1974). According to another provision, *N.J.S.A.* 48:2–21.3, the Board may also accept a written stipulation by a utility

which extends the suspension period beyond eight months or waives the tariff's effective date altogether. *Id.*

 This latter statutory provision was enacted along with the extension of the suspension period to eight months. See *L. 1962, c.* 198, §§ 13, 32.[9] It is therefore available as an interpretive aid when examining the effects of a suspension period's expiration. See, *e. g., State v. Green,* 62 *N.J.* 547, 554–555 (1973); *Loboda v. Clark Tp.,* 40 *N.J.* 424, 435 (1963). The only conceivable purpose for allowing the Board to secure a consensual extension or waiver of the eight-month deadline would be to prevent the utility from taking advantage of the expiration of the suspension period. To conclude otherwise would make obtaining a waiver or extension unnecessary—an idle exercise. The Legislature must have intended that completion of the suspension period would allow the proposed tariff to become effective, just as if the Board had neglected to suspend it at all. This is the only interpretation of the Board's suspension authority which gives genuine significance to the provisions allowing an extension or waiver. Any other construction would render the possibility of an extension or waiver superfluous; such a reading of a statute must be avoided. *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 68 (1978). We therefore hold that the utility can invoke a third remedy for "regulatory lag": at the end of a suspension period, in the absence of a stipulated extension or waiver, the utility's proposed rates may immediately become effective subject to conditions, such as refund, dependent upon the Board's final determination. *Cf. In re Redi-Flo Corp.,* 76 *N.J.* 21, 39 (1978); *Hackensack Water Co. v. Board of Pub. Util. Comm'rs,* 96 *N.J.L.* 184, 188 (E & A 1921).

 The fact that a utility may be entitled to charge higher rates when "regulatory lag" exceeds the statutory suspension

[9]Between 1921 and 1962, the maximum duration of a suspension period was six months. See *L.*1921, *c.* 101, § 1. Prior to 1921 it was three months. See *L.*1911, *c.* 198, § 17(h).

period does not mean it may keep all or even any additional income. The new rate has not been adjudged "just and reasonable"; once proceedings have commenced, the burden of making that showing rests with the utility. *N.J.S.A.* 42:2–21(d). Implementation of a new proposed tariff at the end of the suspension period can then be only provisional. Just as when the Board agrees to an interim adjustment of rates, the new rates bind neither the Board nor the public. See *N.J.S.A.* 48:2–21.1. After the Board finally determines a just and reasonable tariff schedule, the utility should be required to refund any excess income to the affected customers.

Although our view of the operation of the suspension period reflects the clear intent of the Legislature, we realize that the past practice of the Board has apparently ignored that intent. This failure explains the absence from Board regulations of such provisions as a requirement that a utility post a bond for the excess income collected under provisional, unapproved rates, and that any increase is subject to refund, or that a utility give notice to customers and other interested persons if it elects to activate a suspended tariff. These two examples are illustrative of procedures that would strike an equitable balance between the interests of the utility and its consumers when "regulatory lag" threatens the fairness of the ratemaking process. Consistent with its delegated duties of "general supervision and regulation of and jurisdiction and control over all public utilities * *," *N.J.S.A.* 48:2–13, the Board must devise appropriate administrative mechanisms for regulating utilities which elect to implement proposed tariffs at the end of a suspension period.

■ In the meantime, we can fairly infer from the existing regulatory scheme a requirement of notice. *N.J.A.C.* 14:1–6.-15(a)(4) and –6.16(a) obligate a utility to give the Board 30 days advance notice of a new proposed tariff. Twenty days before any hearings begin, municipal clerks within the affected area and the Public Advocate must receive direct notification. *N.J. A.C.* 14:1–6.16(b)(1), (2). Customers must be notified either

directly by bill insert or indirectly by publication. *N.J.A.C.* 14:1–6.16(b)(3). We believe that the rationale of due process and fundamental fairness underlying these notice provisions are equally applicable to the decision by a utility to activate suspended rates. We therefore hold that until the Board issues new regulations on remand, a utility must give the same form of notice at the end of a suspension period as when it files the original petition. Accordingly, it must (1) file notice with the Board 30 days before charging the new rates, (2) serve notice on the Public Advocate and pertinent municipal clerks 20 days in advance, and (3) give 20 days' notice to affected customers by publication or bill insert. Fairness also requires that the utility give direct notice 20 days in advance to any objectors or parties in the rate proceedings not otherwise receiving it.

■ This practice of allowing automatic implementation of proposed rate increases upon advance notification protects the interests of both the utility and the public. The utility is guaranteed that its request for more income, to the extent it is fair and reasonable, will be effectively granted at the end of the eight-month suspension period. Its customers will only be charged with an increase that is just and reasonable; any excess must ultimately be refunded by the utility after a final Board order. Thus there is no need to provide further protection for the utility by allowing the Board discretion to award retroactive rate increases. "[T]he orderly processes of rate-making are necessarily present and prospective if rate-making is to be effective." *In re N.J. Power & Light Co.*, 15 *N.J.* 82, 93 (1954). When existing rates are insufficient to provide a fair return, the proper remedy is a new application for higher rates, not invalidation and revision of those existing. See *In re N.J. Power & Light Co.*, 9 *N.J.* 498, 527 (1952). "The establishment of a rate is the making of a rule for the future * * *." *In re Intrastate Industrial Sand Rates*, 66 *N.J.* at 28 (quoting *Prentis v. Atlantic Coast Line Co.*, 211 *U.S.* 210, 226, 29 *S.Ct.* 67, 53 *L.Ed.* 150, 158 (1908)). Consistent with the general practice of rate making in

New Jersey, we hold that regardless of the presence of even unreasonable "regulatory lag," a newly filed tariff may not be given retroactive effect except for the purpose of refund mentioned above. See *In re Intrastate Industrial Sand Rates*, 66 *N.J.* at 23; *In re N. J. Power & Light Co.*, 15 *N.J.* at 92–93.

■ In the present case, the Water Company gave no notice and, as conceded on oral argument, never intended to put the proposed tariff into effect until the Board's decision. Without such notice of its intention, it is not entitled to implement its proposal even provisionally. Moreover, we hold that its newly filed tariff may not be given retroactive effect.

The judgment of the Appellate Division is reversed. There is still pending for resolution a question concerning an expense item for federal income taxes. Since this issue is not before us, our holding does not disturb the Appellate Division's remand to the Board for recalculation.

*For reversal*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—6.

*For affirmance*—None.