248 N.J. Super. 367 (1991)
591 A.2d 631
IN THE MATTER OF THE ASSIGNMENT OF EXPOSURES TO THE AETNA CASUALTY AND SURETY COMPANY, ALLSTATE INSURANCE COMPANY AND COLONIAL PENN INSURANCE COMPANY.
Superior Court of New Jersey, Appellate Division.
Argued March 6, 1991.
Decided May 20, 1991.
*370 Before Judges LONG, R.S. COHEN and STERN.
Mark F. Horning, pro hac vice, argued the cause for appellant the Aetna Casualty and Surety Company (Hannoch Weisman, and Steptoe & Johnson, attorneys, Mark F. Horning and Susan Stryker on the brief).
Duane C. Quaini, pro hac vice, argued the cause for appellant Allstate Insurance Company (Smith, Stratton, Wise, Heher & Brennan, and Sonnenschein Nath & Rosenthal, attorneys, *371 Duane C. Quaini, William J. Brennan, III, Suzanne M. McSorley, William T. Barker, Jeffrey P. Lennard and Steven M. Levy of counsel and on the brief).
Rosalie Burrows argued the cause for appellant Colonial Penn Insurance Company (McCarter & English, attorneys, Rosalie Burrows of counsel and Richard H. Bagger and Andrew O. Bunn on the brief).
Donald Parisi, Deputy Attorney General, argued the cause for respondent (Douglas S. Eakeley, Acting Attorney General, attorney, Joseph L. Yannotti, Deputy Attorney General, of counsel, Donald Parisi and Carol Johnston, Deputy Attorneys General, on the brief).
The opinion of the court was delivered by COHEN, R.S., J.A.D.
Aetna, Allstate and Colonial Penn are insurers doing auto insurance business in New Jersey. On January 24, 1991, the Commissioner of Insurance ordered each of them to issue auto policies, commencing April 1, 1991, to thousands of "exposures" (private passenger cars requiring insurance) then insured in the "residual" market through the Joint Underwriting Association. The order was in furtherance of the phasing-out or "depopulation" of JUA undertaken by the Commissioner pursuant to the Fair Automobile Insurance Reform Act of 1990 ("FAIR Act"). L. 1990, c. 8. The initial set of orders went to 44 insurers and required coverage of some 211,000 exposures. We stayed the effect of the depopulation orders pending the appeals, consolidated them, and accelerated briefing and argument.[1] We now *372 affirm the depopulation orders in part, but we invalidate them in part as unauthorized by the enabling legislation.
The setting is the perennially troubled New Jersey auto insurance market. The legislative highlights of the past twenty years start with the adoption in 1970 of the assigned risk plan, which authorized the forced distribution among insurers of auto insurance applicants who were unable to procure coverage "through ordinary methods." N.J.S.A. 17:29D-1. Effective on January 1, 1973, was the New Jersey Automobile Reparation Reform Act, N.J.S.A. 39:6A-1 et seq., which made auto insurance compulsory and created extensive no-fault benefits but imposed a tort suit threshold that barred very few tort suits. See also N.J.S.A. 39:6B-1.
In 1983 appeared the New Jersey Automobile Full Insurance Availability Act, N.J.S.A. 17:30E-1 et seq., whose purpose was to supplant the assigned risk system and "to assure to the New Jersey insurance consumer full access to automobile insurance through normal market outlets at standard market rates, ... and to require that companies be made whole for losses in excess of regulated rates on all risks not voluntarily written...." N.J.S.A. 17:30E-2. Unlike the assigned risk system, the new legislation contemplated coverage provided by JUA, at standard market rates, to risks rejected by the voluntary market. Although policies were to be issued in the names of servicing insurers, the risks would be borne by JUA, and servicing insurers would be paid fees for handling coverage, premiums and claims. JUA's underwriting losses, which were inevitable, would be made up from bad-driver and accident surcharges imposed by the Division of Motor Vehicles and JUA, and the "residual market equalization charge" ("RMEC"), which was to be levied equally on all autos insured in the *373 voluntary and residual markets except those with principal drivers aged 65 years or older. N.J.S.A. 17:30E-8b. See Senate Labor, Industry and Professions Committee Statement, Assembly, No. 1696-L. 1983, c. 65. The RMECs were to be sufficient to permit JUA to operate on a no-profit, no-loss basis. N.J.S.A. 17:30E-3o.
In 1988, amendments to various statutes were made to correct deteriorating conditions in the auto insurance industry. Insurers were more and more restricting their voluntary coverage to the most favorable risks, leaving fully half of the State's drivers to be covered through JUA at artificially low rates. JUA was experiencing constantly worsening imbalances, and was kept afloat by increasingly large charges imposed on all New Jersey drivers. See Governor's Reconsideration and Recommendation Statement, Senate No. 2637-L. 1988, c. 119. Blame was variously assigned by various people. It was the overgenerous no-fault law. It was the refusal of the Commissioner of Insurance to permit insurers to earn an adequate rate of return on voluntary business. It was the refusal of insurers to provide coverage to urban drivers.
The new statutes introduced an optional verbal threshold for tort actions, N.J.S.A. 39:6A-8, 8.1; flex-rating for insurers, N.J.S.A. 17:29A-44; an insurers' excess profits law, N.J.S.A. 17:29A-5.6 et seq.; 10% annual increases in JUA rates for bad drivers for four years, N.J.S.A. 17:30E-13a through d, an authorization for deferral of JUA payments of bodily injury losses when JUA's income is insufficient to meet its obligations, N.J.S.A. 17:30E-8.1; an authorization for a multi-tier rating system in the voluntary market, including rates for good drivers and substandard risks, N.J.S.A. 17:29A-45; and a requirement for the audit of servicing carriers to find and recover overcharges resulting from their claims practices, and treble damages for wilful overcharges. N.J.S.A. 17:30E-17.1. See Senate Labor, Industry and Professions Committee Statement, Assembly No. 3702-L. 1988, c. 156.
*374 Perhaps the most important aspect of the 1988 legislation was a scheme for the downsizing, or depopulation, of JUA over a four-year period, to the end that it would serve only its original purpose of providing insurance coverage for the least desirable risks. N.J.S.A. 17:30E-14. Those residual risks would be charged self-sustaining rates, which would not be subsidized by the voluntary market. The statute directed the Commissioner to establish procedures to govern the voluntary market's[2] writing of JUA insureds and applicants for insurance. In annual increments, the voluntary market insurers were to increase the percentage of private passenger car exposures they insured in the voluntary market from 50% to 60%, then 70%, 75% and 80%. Methods were prescribed for apportioning and assigning to voluntary market insurers the number of JUA insureds sufficient to make up any shortfall that occurred in the required annual increase in voluntarily written policies.
On March 12, 1990, the FAIR Act became law, effective immediately. It attacked most of the same problems to which the 1988 legislation was addressed. It did so, however, in a more urgent and drastic manner. One of the elements of the FAIR Act was the imposition on the voluntary market of surtaxes and assessments to satisfy the $3.3 billion of accumulated obligations of JUA.[3] Fees to be collected from doctors, *375 lawyers, and auto body shops were also devoted to the same purpose. N.J.S.A. 17:33B-58 to 63. Most importantly, the Legislature abandoned JUA as a continuing insurance market mechanism.
The function of JUA was turned over by the statute to the Market Transition Facility ("MTF"). MTF was expected to operate from October 1, 1990 to September 30, 1992, when it would go out of business. Premiums on policies issued by MTF were initially to be based on September 30, 1990 JUA rates. N.J.S.A. 17:33B-11. No RMECs, however, were to be charged after April 1, 1991. The loss of MTF support would have to be made up from other sources. MTF's profits and losses were to be apportioned among the auto insurers. N.J.S.A. 17:33B-11d. It was expected that JUA's business would already have decreased to 40% of the total private auto market under the 1988 legislation, and then to 32% soon after enactment of the 1990 FAIR Act. By April 1, 1991, only 29% of the market was to be covered by MTF; by October 1, 1991, 20%, and by April 1, 1992, 10%. MTF was to write no new business after October 1, 1992, after which exposures rejected by the voluntary market would be relegated to the assigned risk plan. N.J.S.A. 17:33B-11c(5); 17:29D-1.
It was pursuant to the 1990 FAIR Act that the Commissioner promulgated his January 24 depopulation orders. There were 44 orders issued, one to every insurer that failed to meet its share of the first stage of distribution of JUA insureds to the voluntary market. There were 24 other insurers that had already met their quotas, and therefore avoided the obligation to accept further exposures to satisfy the goal of reducing the portion of the auto insurance market covered by JUA/MTF. The appellants suspect that these 24 insurers made their quotas by "cherry-picking" the least-risk JUA/MTF insureds. That *376 may be so. If it is, the appellants had the same opportunity, and apparently chose not to utilize it.
The insurers raised various objections to the orders. Our approach to each of the issues presented by these appeals is governed by some basic principles. It is clear that the insurance industry is strongly affected with a public interest, and is therefore properly subject to comprehensive regulation to protect the public welfare. Sheeran v. Nationwide Mut. Ins. Co., 80 N.J. 548, 559, 404 A.2d 625 (1979). The Legislature has broad discretion in adopting police power regulations governing the insurance business to promote what the Legislature views as the public interest. This includes the power to compel insurers to cover people they would rather not insure. California State Auto. Ass'n Inter-Ins. Bur. v. Maloney, 341 U.S. 105, 71 S.Ct. 601, 95 L.Ed. 788 (1951). It also includes requiring insurers to renew policies they would like to drop. Sheeran, supra, 80 N.J. at 560, 404 A.2d 625. The State's broad regulatory powers must be exercised, however, so as to allow insurers a fair and reasonable return. Id.
Administrative actions, such as the Commissioner's depopulation orders, must be upheld unless they exceed his statutory authority, or are arbitrary, capricious or unreasonable. Henry v. Rahway State Prison, 81 N.J. 571, 579-580, 410 A.2d 686 (1980). The burden is on the objector to overcome the presumption that agency actions are valid and reasonable. Medical Soc'y of New Jersey v. New Jersey Dept. of Law and Public Safety, 120 N.J. 18, 25, 575 A.2d 1348 (1990). The Commissioner's expertise in the field of insurance must be given great weight. IFA Ins. Co. v. New Jersey Dept. of Ins., 195 N.J. Super. 200, 206-207, 478 A.2d 1203 (App.Div.), certif. denied, 99 N.J. 218, 491 A.2d 712 (1984).

I.
The insurers' first objection was that the depopulation orders assigned JUA/MTF exposures that were not eligible *377 under the FAIR Act for assignment to the voluntary market. They argued that the depopulation orders made assignments of the entire books of business of producers[4] in particular territories without regard to the likelihood that the books contain individual risks so substandard that they must ultimately be in the 10% that will be relegated to the assigned risk pool after MTF completes its transitional function. The Commissioner conceded that he included such risks in his orders, but argued (a) that § 20 of the FAIR Act permitted him to determine that all drivers would be eligible, (b) that it was utterly impractical for him to weed out the worst risks, and (c) that assigning only good drivers and keeping the bad in MTF would be unfair to other MTF insureds and would improperly reward insurers who did not meet their voluntary depopulation quotas and therefore had to accept assignments.
N.J.S.A. 17:33B-13 contains a definition of "eligible person." In general, it is a person who has not given any of the seven listed indications of presenting an enhanced insurance risk, such as accidents, criminal convictions, and an accumulation of auto insurance eligibility points. However, the definition expressly applies only to a listed group of statutory provisions that deal with post-MTF eligibility for the voluntary market. FAIR Act § 20, N.J.S.A. 17:30E-14, is not one of those provisions. N.J.S.A. 17:30E-14 was a part of the 1988 legislation and survives as amended in 1990. N.J.S.A. 17:33B-13 was newly enacted in 1990. N.J.S.A. 17:30E-14 authorizes the Commissioner to develop "criteria identifying drivers who should be eligible for coverage in the voluntary market," and to make assignments of people meeting those criteria. The Commissioner argued in briefs before us that the N.J.S.A. 17:33B-13 definition does not control, and that it was permissible for him to exercise his judgment to determine that every person *378 insured by JUA/MTF was eligible for the voluntary market for the purpose of the depopulation orders.
At oral argument before us, for reasons not explained, the Commissioner announced that he had changed his mind. His new position was that he agreed with the insurers that they should have to provide coverage only for exposures that would be considered eligible under N.J.S.A. 17:33B-13. He added, however, that the insurers would have to investigate and identify the ineligibles assigned to them, and he would not afford them sufficient time to do so before their coverage obligation attached. That position created the serious question whether the insurers would thereafter be permitted to shed the insureds they discovered were ineligible after initiating coverage.
Because we sensed that an equitable accommodation could be reached, we gave the parties time to confer. They ultimately arrived at a solution which gave the insurers the burden of identifying ineligible exposures, but which also gave them sufficient time to permit them to withhold offering coverage to ineligibles and to permit the ineligibles to remain MTF insureds.
The issue of eligibility was thus equitably and sensibly resolved by the parties. We describe the dispute, and the manner in which the confrontation was dissolved, for a purpose. It is to put other disputes raised before us in better perspective. It is also to demonstrate that a more deliberate process of legislative enactment and administrative implementation could have prevented the actors from feeling obliged to take sword's point litigation postures on a number of matters having sensible and reachable solutions.

II.
N.J.S.A. 17:30E-14a instructs the Commissioner to establish "an equitable apportionment procedure" for the assignment of JUA/MTF insureds to insurers who fail to meet their periodic quotas. What the Commissioner did in the present group of depopulation orders was to distribute first the *379 JUA/MTF insureds from those geographical territories in which the voluntary market covered the lowest percentages of the total exposures. Those territories are urban and economically depressed areas where, according to the insurers, a disproportionate number of high-risk insureds are located. In addition, they argue, New Jersey's capped premium rates are purposely set at levels insufficient to reflect the extent of the risks actually incurred in covering inner city insureds. Selecting those least favored risks for assignment has the effect, according to the insurers, of imposing on them the penalty of writing the greatest-loss policies after other insurers have skimmed the cream of the JUA/MTF exposures. Instead, the exposures to be assigned in the depopulation orders should have been chosen at random from the entire list of eligible JUA/MTF exposures, without regard to territory. Only by that means, according to the insurers, could an equitable apportionment have been made.
There are a number of answers. The first is that the facts have changed since the insurers developed their argument. The change is the significant one of the Commissioner's agreement to let them delete from the depopulation orders the drivers deemed ineligible under N.J.S.A. 17:33B-13. The second answer is that The FAIR Act permits insurers taking on the coverage of assigned exposures to charge them MTF premium rates, which are higher than the voluntary market rates. N.J.S.A. 17:33B-12. The MTF rates will be even higher for bad drivers. N.J.S.A. 17:29A-35. The prospect of taking on bad risks at low rates is therefore not as dire as the insurers contend. The third is that every insurer had the opportunity to "cherry-pick", that is, each of them has known for many months the number of JUA/MTF exposures it had to take on in order to avoid assignments in the depopulation orders. Some insurers chose to reach out to add to their share of the market. Others chose not to do so. The "equitable apportionment" of exposures is not necessarily achieved by placing insurers that *380 have chosen to remain part of the problem on a par with insurers that have come forward to participate in the solution.
The fourth answer is that equity among insurers is not the only equity that legitimately concerned the Legislature and the Commissioner. The plain fact is that urban auto owners have not had fair access to the voluntary auto insurance market in recent years. The result is that great numbers of perfectly sound drivers have been relegated to JUA coverage. Perhaps it is because insurers abandoned the inner cities for profitable suburban business, without distinguishing good urban drivers from bad, as the Commissioner contends. Perhaps it is because the State did not permit the insurers to write inner city business without incurring substantial and irremediable losses, as the insurers reply. The early assignment of urban exposures in the depopulation process serves to give good urban drivers the same access to the benefits of the voluntary market as their suburban counterparts. Those benefits include a greater choice of benefits and carriers, and, eventually, of costs.
The choice the Commissioner made responds to legitimate legislative concerns in a reasonable way that does not unfairly prejudice the insurers. In these circumstances our responsibility is not to interfere.

III.
The insurers next argue that the feature of the depopulation orders assigning producers to the insurers with their books of business directly contravenes the letter and spirit of N.J.S.A. 17:30E-14i(3). The Commissioner argues that the assignment of producers is a legitimate effort on his part to effectuate the legislative will as derived from harmonizing N.J.S.A. 17:30E-14i(3) with N.J.S.A. 17:33B-9c, both of which deal with the role of JUA/MTF producers during and after the process of depopulation.
N.J.S.A. 17:30E-14i(3) is a part of the 1988 legislation that first approached the subject of downsizing JUA. It deals with *381 the procedures to that end which the Commissioner was told to develop. It provides that those procedures shall
neither prohibit nor require member companies to write association business through association producers of record, provided, however, that where a member company elects not to service such business through the association producer of record, the procedures shall address the manner in which the association shall transfer the business to the member company, and shall establish reasonable compensation in an amount sufficient to offset the actual expenses incurred by the association producer in conjunction with the transfer which shall be paid by the association upon transfer of the business to the member company;
As we understand the provision, it says that an insurer taking on former JUA exposures as part of the depopulation plan may continue to write the business through the JUA producer who has been writing it, but need not do so if it does not want to. If the insurer chooses not to write the business through the JUA producer, JUA transfers the exposure to the assigned insurer, and JUA pays the producer for the actual expenses of transfer. Even though the quoted language was part of the 1988 legislation, it appears as a part of § 20 of the FAIR Act, which is the section that amends the 1988 legislation to shorten the time periods for depopulation increments. It would be impossible in those circumstances to disregard the language, as the Commissioner says we should, as "a remnant" of earlier legislation which somehow slipped into the new law. We cannot assume that the Legislature did not know what it was enacting.
N.J.S.A. 17:33B-9c is new language in the FAIR Act, and is therefore, according to the Commissioner, the current legislative expression of policy. It says:
The commissioner shall, on or before October 1, 1991, establish a producer assignment program. The program shall be available upon application to any licensed insurance producer who: (1) is a producer for the association; (2) has no affiliation with a voluntary market company for the purposes of placement of private passenger automobile insurance; (3) had an affiliation with an insurance company for the placement of automobile insurance in the voluntary market which was terminated by the insurer on or after December 31, 1980; (4) has demonstrated to the commissioner his competency, efficiency and effectiveness in servicing association and other insurance business as determined by a review of the record of the producer for complaints, violations of the licensing law and other factors deemed relevant by the commissioner; and (5) is located *382 and services insurance in a geographic area which the commissioner has determined to lack sufficient representation for the placement of automobile insurance business in the voluntary market. The program shall provide for the assignment of qualified producers on an equitable basis to insurers writing private passenger automobile insurance in the voluntary market.
As we understand this provision, it is intended to create a post-October 1, 1991 assignment program for certain JUA/MTF producers who wish to participate, and who meet five listed criteria. Among them are that the producer has no affiliation with a voluntary market insurer, and that the producer is located and services insurance in a geographical area which the Commissioner determines has insufficient representation in the voluntary market. The Commissioner is directed to establish a program by October 1, 1991, to assign qualified producers on an equitable basis to voluntary market insurers. He has not yet done so. He has not determined whether the producers assigned to insurers in the January 24 depopulation orders would qualify for assignment under his yet-unestablished program.
The goal of the assignment program is to protect producers who have built businesses and developed insurance expertise writing JUA/MTF policies, and at the same time to encourage an auto insurance sales and service presence in underserved urban areas. The goal of N.J.S.A. 17:30E-14i(3), on the other hand, is to permit voluntary market insurers to accept JUA/MTF assignments of exposures and service them through their own existing organizations, but with JUA/MTF providing compensation for transfer expenses to the affected producer. Aetna, for instance, intends to direct-write its assigned business. Colonial Penn does business only by direct writing.
The Commissioner argues that he "harmonized" the two statutory sections by assigning producers so that they will be able to survive until the October 1 assignment program has been established.[5] Otherwise, he says, the program will be *383 ineffective because the producers will have gone out of business.
It may well be that the producers would experience a lesser impact from the depopulation of JUA/MTF if the assignment of any of their business to the voluntary market had to include them as producers. But that would not justify our ignoring the plain words of N.J.S.A. 17:30E-14i(3), words that were enacted only in 1988 and repeated in the FAIR Act in 1990. They flatly prohibit requiring voluntary market insurers to write assigned JUA/MTF business through the former producer of the business, or requiring the insurers to compensate the producers. If there is a discontinuity in the legislation, the Legislature can correct it in short order if it chooses to do so. But, the Commissioner may not ignore the statute in the name of "harmonization."

IV.
Next, the insurers complain about that part of the depopulation orders that require them to cover the assigned exposures for a full year. Many insurers write six-month policies in their voluntary market business, without any objection from the Commissioner. They argue that they should be able to fold the assigned business into their established practices, and write six-month policies for their newly assigned business.
This is a matter which the Commissioner's judgment should control. He is dealing with the transfer to the voluntary market of hundreds of thousands of exposures. There will inevitably be disruption and inconvenience to everyone involved. In requiring full-year policies, the Commissioner sought to achieve in at least one manageable area a degree of uniformity and predictability. The means seem suited to achieve the *384 desired end. The insurers' understandable concern is their own business convenience, but there is no legal entitlement to write six-month policies, and no real prejudice in being barred from doing so. In this respect, the Commissioner's orders are affirmed.

V.
The insurers also object that the orders unlawfully require them to offer to insure a substantially greater number of exposures than necessary to meet their individual depopulation shortfalls. This is another issue that time seems to have resolved.
The Mandatory Depopulation Assignment Plan stated that the assignments to each insurer would be increased by an "acceptance factor" of 25%. The actual language was:
The number of exposures assigned to each member company shall be increased by an acceptance factor of 25 percent. It is the expectation of the Department that not every offer of coverage made by a member company to its assigned policyholders will be accepted. This expectation is based on the dynamic aspect of the New Jersey automobile insurance market (i.e. Association or MTF policyholders independently seeking coverage with a voluntary insurer, competition among member companies to write additional new business in order to meet future depopulation quotas, and Association or MTF policyholders leaving New Jersey).
* * * * * * * *
The member company must continue to make offers of coverage to all assigned ... policyholders even when the member company has written sufficient exposures to meet its apportionment share shortfall. Any exposures written in excess of the apportionment share shortfall may be used by the member company toward the fulfillment of its next apportionment share.
Two things developed while the appeals were before us. The first was that the increase of 25% was never applied to the insurers involved in these appeals. For a reason not revealed to us, Aetna was not assigned an extra 25% of its shortfall but only an extra 7%. The Commissioner's brief justified the 7% excess on the unsupported thesis that "the industry norm for non-selection of renewals by the insured is 5-10%." Allstate, on the other hand, received an assignment of 94% of its shortfall. *385 Colonial Penn received 99% of its shortfall. It has never been explained to us how the urgent reasons earnestly recited for the original decision to assign a 25% excess have dissipated.
It is apparent that the percentage differences among the assignments is accounted for by the Commissioner's decision to assign exposures in blocks consisting of producers' entire books of business. Since the Commissioner and the insurers have now decided that only eligible persons under N.J.S.A. 17:33B-13 will be assigned, the number of exposures in a producer's book of business can not be used as an accurate measure for assignment. In addition, since we have decided that producers may not lawfully be assigned to the voluntary market insurers with their books of business, there is much less reason to make assignments by use of producers' books, even after culling out the ineligibles.
For those reasons there is no purpose in our ruling on the legality of a depopulation order provision which the Commissioner has apparently abandoned and which, in any event, is no longer justifiable even as a convenience.

VI.
Allstate argues that the Commissioner made "retroactive" changes in the depopulation procedures that "unjustly impact Allstate." The reference is to the formula by which the quota of each insurer was to be calculated and the manner by which exposures were to be selected for assignment. Allstate contends that it made underwriting decisions in reliance on the depopulation plan adopted by the Commissioner before the FAIR Act (1) to use a 50-50 weighting of insurers' 1983 and 1988 voluntary business in the quota formula, and (2) to make assignments on a random basis. After those decisions were made, the Commissioner changed the ground rules by amending the formula to use a 75-25 weighting of the insurers' voluntary 1983 and 1988 business, thereby discounting recent *386 shrinkage of an insurer's voluntary business,[6] and by deciding to assign JUA/MTF exposures by territory and without regard to statutory eligibility. "Obviously," Allstate argues, "had Allstate known in a timely fashion that its obligations to insure former JUA insureds would be retroactively enlarged to require insurance of more exposures, to exclude any eligibility criteria in the assignment process, and to selectively assign from the most underpriced territories, Allstate would have expanded its underwriting guidelines and made targeted sales efforts so as to enable it to initially insure more of the better JUA risks, avoiding the need to later accept the worst of these risks."
There are a number of sound answers. The first is that Allstate does not demonstrate in any way what makes it obvious that it would have made consequential changes in underwriting or in corporate strategy. Skimming the cream from JUA was always encouraged by the depopulation plans. The only effect of the changes was to make skimming an even better idea. The second is that the problem of the assignment of ineligibles has been resolved in Allstate's favor by the Commissioner. The third is that it is sensible to give 1983, the last year before the voluntary market had JUA available as a dumping ground for undesirable risks, three times the weight as 1988, the fifth year of JUA operation, when it had absorbed fully half of New Jersey's drivers. The fourth is that the challenged changes in the Commissioner's approach to the pressing problems he faced were responsive to the urgency displayed by both the letter and the spirit of the FAIR Act. In sum, Allstate has not shown either that it did in fact rely on the 1989 plan, or that such reliance was justified, detrimental and such as to create a protectible interest against change. Thus, *387 we need not rule on the appropriateness of estoppel as a remedy for changing administrative action.

VII.
Finally, all of the insurers argue that it is unconstitutional for the Commissioner to implement the depopulation plan because (a) they are operating at a loss in their New Jersey auto insurance businesses, (b) the Commissioner is purposely and unlawfully delaying consideration of rate filings they have made seeking necessary premium increases, and (c) as things now stand, they will inevitably lose money on the new business that the Commissioner proposes to assign them.
The parties do not disagree about the law applicable to this issue. The insurers are entitled to earn a reasonable rate of return on their New Jersey auto insurance business. Sheeran, supra, 80 N.J. at 560, 404 A.2d 625. The return should be one which is generally commensurate with returns on investments in other enterprises having comparable risks. State Farm Mut. Auto Ins. Co. v. State of New Jersey, 124 N.J. 32, 48, 590 A.2d 191 (1991). There is no right to make money on every policy written, or on every day of business. There is, however, a right to have the regulatory agency which exercises the rate-making function do its job reasonably promptly, and with no more delay than is necessarily involved in the review process itself. Helmsley v. Borough of Fort Lee, 78 N.J. 200, 226-230, 394 A.2d 65 (1978), appeal dismissed, 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979). The prime reason for expecting prompt consideration of rate increases is that they are prospective only. Petition of Elizabethtown Water Co., 107 N.J. 440, 452-459, 527 A.2d 354 (1987). Thus, rates that were inadequate during a prolonged review process can not be retroactively increased or otherwise made up.[7] In addition, the insurers *388 argue that, although a certain period of regulatory lag is unavoidable, it is one thing to ask insurers to continue writing insurance they voluntarily contracted for while proposed rate hikes are carefully examined, but it is altogether another thing to coerce insurers to take on new business they do not want, at currently inadequate rates, and tell them to be patient while their requests for adequate rates wend their way through the regulatory process.
What the parties disagree about, at the tops of their voices, are the facts. The record before us is full of significant and irreconcilable factual differences. The insurers offer complex financial analyses and the assurance of their actuaries and executives that they are losing millions of dollars on their current New Jersey business. They say the near future promises even greater losses with or without their assigned JUA/MTF business, that the Commissioner is dragging his feet in considering their rate filings, and that forcing more business on them at insufficient rates is confiscatory. The Commissioner offers equally complex analyses and the assurance of his actuaries that the insurers are really doing just fine, and that their complaints are baseless.
The insurers and the Commissioner not only disagree on the facts. They also accuse each other of bad faith, and describe each other's motives as unworthy, tactics as inappropriate, and goals as improper. There is a counterproductive air of distrust and hostility that surrounds the subject and displaces reasonable discussion.
However good the insurers' evidence may be of currently insufficient rates on their voluntary business, that evidence does not bear directly on the economic impact of their taking on JUA/MTF exposures. One reason is that they have rate filings pending which could result in higher revenues. Another reason *389 is that they need not charge their voluntary market rates to the exposures they are assigned. Instead, they can charge MTF rates. Current MTF rates are higher than the current voluntary market rates of Aetna and Allstate, and, we assume, also of Colonial Penn. In addition, MTF rates will be supplemented for substandard drivers who are still eligible for assignment. The supplement may not be as great as the insurers think will be necessary, but that is very difficult to evaluate now. Moreover, MTF has already applied to the Commissioner for a 28% rate hike, approval of which would further increase premium levels. Not enough, say the insurers, pointing out that MTF has announced that its rates need a 60% increase to permit MTF to break even; insurers are entitled to earn a profit, and MTF's break-even rates are therefore inadequate by definition.[8]
The insurers do not make a case of sufficient strength to justify our entering an order freezing in place a currently disastrous insurance industry situation until the insurers' hyperbole can be tested against the Commissioner's incredulity. The resulting turmoil in the State's auto insurance industry would be intolerable.
The insurers suggest another possibility, which is that the depopulation process proceed with the Commissioner's permitting them to charge interim enhanced premium rates on assigned exposures, the excess of which would be escrowed by the insurers until all of the relevant rate filings have been considered and approvals made to raise voluntary market and MTF rates to a level at which the insurers will be able to earn an adequate return.
The Commissioner replies that he has no power to approve interim rates with effective consumer protections against overcharges. *390 We need not resolve that dispute. Cf. New Jersey St. AFL-CIO v. Bryant, 55 N.J. 171, 260 A.2d 225 (1969).
The insurers will be able to charge the recently enhanced MTF rates to their assigned exposures. That creates a better situation than was predicted for the insurers at the time of their briefs and oral arguments. Whether it is better enough would no doubt be the subject of some disagreement. We are in no position, however, to predict whether that untested new business taken on by the insurers from MTF at untested new MTF premium rates will result in future losses so clear and significant that the insurers are entitled to protection in advance.
Except as to the provision for the assignment of producers and those matters which we have said have been resolved without our decision, i.e., the assignment of ineligibles and the assignment of an excess of 25% of quota, the January 24, 1991 depopulation orders of the Commissioner are affirmed.
NOTES
[1] Colonial Penn Insurance Company had a special problem. It had an already-filed appeal pending in this court relating to the Commissioner's order establishing the conditions under which it would be permitted to withdraw from the New Jersey auto insurance market. One of those conditions was that withdrawal could take place only over a period of five years. During that time, Colonial Penn would be exposed to FAIR Act obligations for the depopulation of JUA and the satisfaction of JUA deficits. We consolidated Colonial Penn's appeal from the January 24 depopulation order to the extent that it raised issues other than those arising out of its status as a withdrawing insurer, leaving the latter issues for consolidation with its already-filed appeal of the Commissioner's withdrawal order.
[2] The 1988 and 1990 legislation is full of references to compulsory measures to be applied to the "voluntary" market. An example is the obligatory "voluntary market quota" in N.J.S.A. 17:30E-14b(1). The only way for the reader to avoid constant surprises is to read the word "voluntary" without attaching any connotation of free will.
[3] For a discussion of the impact of the surtaxes and assessments on the ratemaking process, see our recently filed Allstate Ins. Co. v. Fortunato, 248 N.J. Super. 153, 590 A.2d 690 (App.Div. 1991). The statute prohibits a carrier to pass through the amount of the surtaxes and assessments in premium increases. The facial constitutional validity of the prohibition was upheld in State Farm Mut. Auto Ins. Co. v. Fortunato, 124 N.J. 32, 590 A.2d 191 (1991), in the light of the constitutional, statutory, and regulatory entitlement of the insurers to an adequate rate of return.
[4] A producer is a licensed agent or broker, N.J.S.A. 17:30E-3(l).
[5] Before us, the Commissioner announced that his assignment of producers would be for one year only, a limitation not contained in the January 24 depopulation orders. The change is not material to the legal problem before us.
[6] Colonial Penn attacks the 75-25 weighting on the basis of its impact on a withdrawing insurer whose 1988 business was a fraction of its 1983 business. We do not foreclose Colonial Penn from making this argument in its appeal from the Commissioner's order establishing conditions for withdrawal.
[7] Board of Public Utilities statutes and regulations deal with the problem of regulatory lag by permitting implementation of interim rates, subject to rebate. See In re Revision of Rates, Toms River Water Co., 82 N.J. 201, 208-212, 412 A.2d 430 (1980).
[8] We understand that, after oral argument before us, the Commissioner completed his review of MTF's rate filing and has granted some but not all of the rate relief MTF sought. We cannot evaluate the impact of his decision on these parties.