935 A.2d 1184

IN THE MATTER OF THE LIQUIDATION OF INTEGRITY INSURANCE COMPANY.

Argued September 24, 2007—Decided December 13, 2007.

*Donald W. Kiel,* argued the cause for intervenor-appellant, American Standard Companies Inc. (*Kirkpatrick & Lockhart Nicholson Graham,* attorneys; *Mr. Kiel* and *Mark S. Morgan,* of counsel and on the briefs).

*David A. Mazie,* argued the cause for appellant, Commissioner of the New Jersey Department of Banking and Insurance, in his capacity as Liquidator of the Estate of Integrity Insurance Company (*Mazie Slater Katz & Freeman,* attorneys; *Mr. Mazie, David M. Freeman* and *Beth G. Baldinger,* of counsel and on the brief).

*Michael R. Cole* argued the cause for respondent, Reinsurance Association of America (*Decotiis, Fitzpatrick, Cole & Wisler* and *Budd Larner,* attorneys; *Joseph J. Schiavone, Jeffrey S. Leonard* and *Christopher P. Anton,* on the briefs).

*Robert P. Haney, Jr.,* submitted a brief on behalf of *amicus curiae,* Foster Wheeler L.L.C.

Justice RIVERA–SOTO delivered the opinion of the Court.

This appeal presents the latest—and not yet final—chapter in the now almost twenty-one-year-old liquidation of Integrity Insurance Company (Integrity). Determining that claims against Integrity's reinsurers that have been incurred but not reported (IBNR claims) could be included as part of the most recent final distribution plan, the Chancery Division also established a mechanism, via a special master and in substitution of contractually agreed-upon arbitration provisions, for the determination of those IBNR claims. The Appellate Division, however, reversed in both respects, concluding that IBNR claims do not qualify for participation in the final distribution of an insolvent insurer's liquidated estate pursuant to *N.J.S.A.* 17:30C–28(a), and that the special master dispute resolution mechanism adopted by the Chancery Division could not be sustained.

The plain language of *N.J.S.A.* 17:30C–28(a) requires that, in order to be cognizable in liquidation, a claim against the liquidated estate must be "absolute against the insurer on or before the last day fixed for filing of proofs of claim against the assets of [an insolvent] insurer[.]" That language does not permit the substitution of estimated claims for "absolute" ones, even when those estimated claims result from the application of sophisticated actuarial estimation methodologies. Because the very claims that would have been subject to the special master dispute resolution process cannot be part of the insolvent insurer's estate, whether that process may override the contractually provided arbitration process becomes moot.

## I.

We previously summarized the history of this case as follows:

Prior to 1986, [Integrity] was a property and casualty insurer licensed to transact business in every state. Most of its risks were subject to reinsurance. Many of the risks (for example, environmental and products liability) were not expected to translate into reportable claims until many years after the policies were issued. In addition, Integrity wrote excess and umbrella policies, under which a duty to pay does not arise until underlying coverages are exhausted.

In December 1986, the Superior Court, Chancery Division entered an order declaring Integrity to be insolvent. The court directed the rehabilitation of Integrity and appointed the New Jersey Commissioner of Insurance and his statutory successors in office as rehabilitators. On March 27, 1987, the court ordered Integrity into liquidation, and appointed the Commissioner as liquidator pursuant to *N.J.S.A.* 17:30C–9. The Commissioner was directed to marshal Integrity's assets and liquidate its liabilities for the benefit of all claimants against its estate.

On June 17, 1996, the Commissioner filed a Final Dividend Plan (FDP) with the court to effect the early termination of the Integrity estate. That novel plan to wind up Integrity's affairs essentially reduced the actuarial estimates of Integrity's future liabilities to present value. Briefly summarized, under the FDP, the liquidator was to (1) estimate and allow the present value of all Contingent Claims, including claims for IBNR losses; (2) collect from reinsurers the present value of any reinsurance that will be due on such claims; (3) arrive at a final determination of Integrity's assets and liabilities; (4) calculate the percentage to be paid on the Fourth Priority [policyholder] claims; and (5) pay a final dividend on all claims accorded Fourth Priority or higher status. The FDP will require Integrity's reinsurers to pay off approximately [ ]800 million dollars of debt.

[*In re Liquidation of Integrity Ins. Co.*, 165 *N.J.* 75, 80, 754 *A.*2d 1177 (2000) (footnote omitted).]

One commentator has described that "novel plan"—the process of estimating IBNR claims—thusly:

A new and significant issue arising in insurer insolvency proceedings with significant impact on reinsurers is the authority of liquidators to estimate the value of contingent claims. Liability insurers facing environmental and similar "long-tail" claims may face substantial losses that have already occurred but which have not yet been reported. These losses are referred to in the insurance industry as IBNR (incurred but not reported losses). Ordinarily, a liquidation proceeding for an insolvent insurer would continue until all claims become fixed. But awaiting the fixation of claims in some contexts would result in substantial delays in resolving the proceedings. In the meantime, there may be losses of potential reinsurance recoveries due to intervening reinsurer insolvencies, and the administrative costs of the proceeding would continue to mount.

One approach recently tried by receivers and liquidators of insolvent insurance companies is to estimate ... the value of IBNR claims and seek reinsurance

recoveries based upon the estimated value. Reinsurers have resisted the estimation approach, understandably fearing an incentive to inflate reinsurance claims on an available deep pocket.

[14–106 *Appleman on Insurance* 2d § 106.9 (2007).]

Ultimately allowing IBNR claims as part of Integrity's final distribution plan, the Chancery Division explained that the Commissioner of Banking and Insurance (Liquidator) had presented "three possible options with respect to the conclusion of Integrity's liquidation." *In re Liquidation of Integrity Ins. Co.*, 299 *N.J.Super.* 677, 680, 691 *A.2d* 898 (Ch.Div.1996). It succinctly outlined those options:

The first option involves a run-off approach and continuing the liquidation until all or substantially all contingent claims become absolute as to value and amount. This option, the Liquidator argues, would result in continuing the liquidation for at least another 10 years (likely longer), thereby delaying the full final dividend to claimants and policyholders, and causing the Estate to incur administrative expenses over the next 10 years of approximately $45 million.

The second option involves a cut-off approach whereby the Estate's liability for any [IBNR] losses would be terminated. The Liquidator argues that this approach would be manifestly unfair to many policyholders and third parties with contingent claims who would lose any recourse to the assets of Integrity's Estate.  ....

The third alternative ... proposes to estimate and, in appropriate cases, allow contingent claims at their net present value using an independent actuarial consulting firm, and collect any reinsurance that may be due on the claims. The Liquidator contends that such an approach will: (1) protect the interests of claimants with contingent claims, (2) abbreviate the delay in making final payment to claimants, (3) maximize the assets of the Estate, (4) reduce administrative expenses, and (5) lighten the burden of Integrity's insolvency on the [state insurance guarantee associations] and the insurance-consuming public. If such a plan is implemented, the Liquidator hopes to conclude the liquidation of Integrity's Estate within three years.

[*Id.* at 680–81, 691 *A.2d* 898.]

Embracing the third option, the Chancery court concluded that "the Liquidator has the statutory authority to determine contingent claims and to permit such contingent claims to participate in distributing [the] assets from the Estate." *Id.* at 692, 691 *A.2d* 898.

Eight years later, when it considered Integrity's fourth amended final dividend plan, the Chancery Division explained that, because it already had determined that IBNR claims could be

included as part of the distribution of Integrity's estate, "the central issue before this Court [was] limited to whether the proposed Fourth Amended Final Dividend Plan achieve[d] that objective (1) using generally accepted estimation techniques; (2) in a commercially reasonable manner; and (3) while protecting the policyholders, insureds, and the public." The Chancery court acknowledged that "an actuarial estimate is not a 100% guarantee. Rather it is an evaluation generated by an actuary using the most up-to-date technology available." It noted that actuarial estimation "is a process that is employed and relied upon by major insurance and reinsurance companies . . . on a regular basis for such transactions as commutations, takeovers and mergers." Concluding that the procedure proposed by the Liquidator satisfied the three prongs of the court's test, the Chancery court authorized the final dividend plan using actuarial estimates for IBNR claims and allowing for a special master to resolve any disputes arising therefrom.

The resolution of Integrity's IBNR claims is of significant import to Integrity's reinsurers. As the Chancery court noted in 1996, "there are an estimated $1.321 billion of [IBNR] losses as of December 31, 1995, which may not become absolute as to liability, coverage, and amount for thirty years or more." *Id.* at 680, 691 *A*.2d 898. It explained that, "[p]ursuant to the plan, Integrity's reinsurers will be obligated to pay on these contingent claims an estimated $876 million. The Liquidator would then utilize this additional source of assets to pay distributions to policyholders and claimants." *Ibid.*

In an unpublished opinion, the Appellate Division reversed. Siding with the position advanced by respondent Reinsurance Association of America (RAA), the panel noted that "[s]ome 26,000 claims, including several thousand policyholder protection claims, have been filed" as part of Integrity's liquidation. It explained that "[t]hese claims fall into three categories: 'paid loss' claims; 'outstanding losses;' and 'incurred-but-not-reported' (IBNR) claims." It defined "paid loss" claims as "those in which liability

to a specific claimant in a specific amount has been identified." It described "outstanding losses" as "those for which a claim has been made by an identified party but the fact of liability and the amount of the claim are unresolved." Finally, and most germane to this appeal, the panel defined IBNR claims as "those that may, by virtue of historical experience, be expected to be filed, although the claimant, the nature of the claim, the responsibility for the claim and the amount of the claim are all unknown." It is estimated that the contingent claims—the "outstanding losses" and the IBNR claims—represent over $2 billion in the aggregate.

Addressing the propriety of recognizing IBNR claims as part of a liquidation plan, the panel concluded that IBNR claims

are actuarial estimates and are, therefore, not absolute. They are derived from standards of measurement that vary according to the judgment of the valuator. They are nothing more than an estimate of the value of a potential actual loss that accounts both for the possibility that the loss will not occur and for the possibility that the extent of the loss will differ from the actuarial estimate. Accordingly, IBNR claims are not absolute and are prohibited by [N.J.S.A. 17:30C-28(a) ] from sharing in the estate.

We granted the application of American Standard Companies, Inc. for leave to intervene and for leave to appeal. *In re Liquidation of Integrity Ins. Co.*, 189 *N.J.* 422, 915 *A.*2d 1046 (2007).[1] We later also granted the Liquidator's motion for leave to appeal as within time. *In re Liquidation of Integrity Ins. Co.*, 192 *N.J.* 287, 927 *A.*2d 1287 (2007). Finally, Foster Wheeler L.L.C. was granted leave to file a brief amicus curiae. For the reasons that follow, we affirm in part and vacate in part the judgment of the Appellate Division.

## II.

The Liquidator, intervenor and amicus urge that the judgment of the Chancery court approving the fourth amended final divi-

---

[1] That application was couched as a petition for certification. However, because we determined that "the matter is interlocutory in nature and should be considered as an application for leave to appeal[,]" 189 *N.J.* 422, 915 *A.*2d 1046, we granted leave to appeal as within time and dismissed the petition for certification as moot.

dend plan be reinstated. They argue that IBNR claims, once subjected to rigorous actuarial estimation, are "absolute" within the meaning of *N.J.S.A.* 17:30C–28(a). In their view, the Appellate Division's interpretation of that statute cannot be sustained because, under that construct, "no contingent claim would ever qualify for distribution[.]" They further posit that if the Legislature had intended that result, it would have said so. Finally, they assert that the only plausible alternative to allowing IBNR claims as part of the liquidation of the estate is the "run-off approach," a far less desirable alternative that would increase substantially both the costs of the administration of the liquidating estate and the length of that liquidation. In the latter respect, they note that, eleven years earlier, the Chancery court estimated that the "run-off approach" would delay Integrity's liquidation for at least an additional ten years at an estimated administrative expense of $4.5 million per year.

In respect of the Chancery Division's acceptance of IBNR claims as "absolute" under *N.J.S.A.* 17:30C–28(a), the RAA notes its agreement with the Appellate Division's conclusions that IBNR claims are—by their very nature—estimates and thus not absolute, and that the statute does not allow for anything other than "absolute" claims to be part of a final dividend plan of an insolvent insurer. Asserting that it is more than willing to meet all contractual obligations under the various reinsurance contracts if and when they come due under the terms and conditions of those specific contracts, the RAA argues that the only proper option under the statute is the first option outlined by the trial court, that is, the "run-off approach" that would continue the liquidation until all or substantially all contingent claims become absolute as to value and amount.

### III.

Our task in this appeal is straightforward: to determine the meaning of *N.J.S.A.* 17:30C–28(a)(1). That statute provides that, in the liquidation of an insurer's estate,

> [n]o contingent claim shall share in a distribution of the assets of an insurer which has been adjudicated to be insolvent ..., except that such claims shall be considered, if properly presented, and may be allowed to share where
>
> (1) Such claim becomes absolute against the insurer on or before the last day fixed for filing of proofs of claim against the assets of such insurer[.]

This appeal, then, presents an issue of statutory interpretation, "a question of law that we review *de novo.*" *Toll Bros., Inc. v. Twp. of W. Windsor,* 173 *N.J.* 502, 549, 803 *A.*2d 53 (2002) (citing *Balsamides v. Protameen Chem., Inc.,* 160 *N.J.* 352, 372, 734 *A.*2d 721 (1999)). We have explained that,

> [w]hen interpreting a statute, our overarching duty is to construe and apply the statute as enacted. We do so by applying the following principles. First, a court should not resort to extrinsic interpretative aids when the statutory language is clear and unambiguous, and susceptible to only one interpretation. That said, if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, including legislative history, committee reports, and contemporaneous construction. We have explained that we may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language. We are guided by first principles: our analysis ... begins with the plain language of the statute.
>
> [*Daidone v. Buterick Bulkheading,* 191 *N.J.* 557, 565–66, 924 *A.*2d 1193 (2007) (citations, internal quotation marks and editing marks omitted).]

Throughout, our analysis is informed by the injunction that " 'words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language.' " *Soto v. Scaringelli,* 189 *N.J.* 558, 570–71, 917 *A.*2d 734 (2007) (quoting *N.J.S.A.* 1:1–1).

■ This dispute centers on the meaning of the word "absolute." The Liquidator, intervenor and amicus argue that, in the context of the statutory scheme governing the liquidation of insolvent insurers, the term "absolute" must also encompass those claims that are the product of generally accepted estimating techniques applied in a commercially reasonable manner, so long as those estimating techniques protect the policyholders, the insureds and the public. The RAA counters, however, that "absolute" means precisely that—absolute—and that the clear legisla-

tive choice for those claims cognizable in an insurance company's liquidation must be honored.

We agree with the position pressed by the RAA. The unambiguous terms of *N.J.S.A.* 17:30C–28(a) demonstrate that the Legislature specifically selected which claims would be honored in the insurance company liquidation context. At the outset, the Legislature determined that *"[n]o contingent claim* shall share in a distribution of the assets of an insurer which has been adjudicated to be insolvent[.]" *N.J.S.A.* 17:30C–28(a) (emphasis supplied). Thus, the overarching legislative intent plainly is to bar *any* contingent claim. The statute then admits of two—and only two— exceptions: when a contingent claim "becomes absolute against the insurer on or before the last day fixed for filing of proofs of claim against the assets of such insurer[,]" *N.J.S.A.* 17:30C–28(a)(1); *or* when "[t]here is a surplus and the liquidation is thereafter conducted upon the basis that such insurer is solvent[,]" *N.J.S.A.* 17:30C–28(a)(2). Only the former exception is relevant here.[2]

■ Moreover, we are persuaded by the Appellate Division's definition of IBNR claims as "those that may, by virtue of historical experience, be expected to be filed, although the claimant, the nature of the claim, the responsibility for the claim and the amount of the claim are all unknown[,]" and its reasoning and conclusion that, given the plain meaning of *N.J.S.A.* 17:30C–28, "IBNR claims are actuarial estimates and are, therefore, not absolute." Seeking the generally accepted meaning of the term,

---

[2] Subsection (b) of the statute addresses a related area and offers further insight into the Legislature's intent. It provides that any person who has a cause of action against an insured of an insolvent insurance company may file a claim in the liquidation proceeding, even if that claim "may be contingent[.]" *N.J.S.A.* 17:30C–28(b). Furthermore, those third-party claims may be allowed if, among other requirements, it may be "reasonably inferred" from the proofs that the person "would be able to obtain a judgment upon such cause of action[.]" *Ibid.* Unlike the requirement in subsection (a) that claims be "absolute," the Legislature adopted a different standard, designed to cover non-final, contingent third-party claims, where it so intended.

the panel concluded that "absolute" is "synonymous with 'unconditional' or 'non-contingent[.]'" Our independent review of the meaning of "absolute" yields similar results. *See Webster's Third New International Dictionary* 6–7 (1966) (defining "absolute" as "free from conditional limitation[;]" "operating or existing in full under all circumstances without variation or exception[;]" "free from doubt[;]" "positive, unquestionable[;]" "independent of arbitrary standards of measurement[;]" "free from qualification[;]" and "final and not liable to modification or termination"); *Webster's II New College Dictionary* 4 (1995) (defining "absolute" as "[p]erfect in nature or quality[;]" "[n]ot limited by restrictions or exceptions[;]" "[u]nqualified in extent or degree"). Of these definitions, the most apt in this context is that "absolute" means "[s]omething considered to be independent of and unrelated to anything else." *Webster's II New College Dictionary, supra* at 4. Because the process by which the Liquidator proposes to estimate IBNR claims of necessity entails looking outside of each claim to other similar claims in respect of their very existence, nature, extent and cost, IBNR claims fail to satisfy that most basic of requirements in order to be "absolute": that in order for a claim to participate in the liquidation of an insolvent insurer's estate, the claim, in each of its fundamental respects, must stand on its own, and not by reference to any other claim.[3]

---

[3] This conclusion is shared by those states that similarly restrict participation in the assets of liquidated insolvent insurers to liquidated claims, as well as by commentators in this field. *See, e.g., Quackenbush v. Mission Ins. Co.,* 46 *Cal.App.*4th 458, 54 *Cal.Rptr.*2d 112, 113 (1996) (holding that IBNR claims are barred by statute forbidding payment from insolvent insurer's estate of "claims founded upon unliquidated or undetermined demands"); *In the Matter of the Liquidation of Am. Mut. Liab. Ins. Co.,* 434 *Mass.* 272, 747 *N.E.*2d 1215, 1233–34 (2001) (criticizing Chancery Division's analysis in *In re Liquidation of Integrity Ins. Co., supra,* 299 *N.J.Super.* at 680, 691 *A.*2d 898 that IBNR claims are cognizable in the insurance company liquidation context, and rejecting unliquidated claims in that context). *See generally* 14–106 *Appleman on Insurance* 2d § 106.9 (2007) (summarizing status of IBNR claims in insurance company insolvency proceedings). *See also* Mary Cannon Veed, *Cutting the Gordian Knot: Long–Tail Claims in Insurance Insolvencies,* 34 *Tort & Ins. L.J.* 167, 183 (1998) (positing that Chancery Division's "analysis [in *In re Liquidation of Integrity Ins.*

In the end, the vice of IBNR claims is that they are not "absolute" as of the claim bar date. If IBNR claims cannot so qualify, they cannot participate in the final dividend plan. To that extent, then, the fourth amended final dividend plan approved by the Chancery court cannot be sustained.

No doubt our conclusion delays, yet again, the final liquidation of Integrity's estate, which may result in an increase in administrative costs. That result, however, is compelled by our obligation to hew to the Legislature's mandate. The Legislature, in the rational exercise of its discretion, in the future may amend *N.J.S.A.* 17:30C–28 to allow estimated claims to participate in the assets of a liquidated insolvent insurer. As presently written, however, *N.J.S.A.* 17:30C–28 does not permit any claim other than an "absolute" or unconditional claim to share in the estate of an insolvent insurer, and, as written, that statute's mandate must be honored.

## IV.

Because we conclude, as the Appellate Division did, that IBNR claims are not cognizable as "absolute" claims under *N.J.S.A.* 17:30C–28(a), we need not consider whether the special master/dispute resolution mechanism for the processing of IBNR claims adopted by the trial court improperly violates the parties' choice of arbitration as their dispute resolution mechanism. In more technical terms, we need not address whether, in light of the arbitration provisions in each of the reinsurance contracts with Integrity, the reverse preemption provisions of the McCarran–Ferguson Act, 15 *U.S.C.* §§ 1011–1015, supersede the mandate for arbitration contained in the Federal Arbitration Act, 9 *U.S.C.* §§ 1–16, and the Convention on the Recognition and Enforcement

*Co., supra*] can be questioned. If the claims in question are, indeed, 'contingent' within the meaning of [*N.J.S.A.* 17:30C–28(a)], the statute would appear to require that they be made 'absolute against the insurer.' Just how that is supposed to happen when no individual claimant has been identified is hard to conceive.").

of Arbitral Awards, 9 *U.S.C.* §§ 201–208. To the extent the Appellate Division nevertheless reached that issue, that portion of the judgment below is vacated as moot.

## V.

The judgment of the Appellate Division is affirmed in part and vacated as moot in part, and the cause is remanded to the Chancery Division for further proceedings consistent with this opinion.

Justice LONG, dissenting.

In deciding that the Rehabilitation and Liquidation Act, *N.J.S.A.* 17:30C–1 to –31, prohibits the Commissioner of Banking and Insurance, as Liquidator of the Estate of Integrity Insurance Company, from estimating incurred-but-not-yet-reported (IBNR) claims, the majority leaves the Commissioner with a Hobson's choice: to extinguish millions of dollars of occurrence-based coverage purchased by policyholders or to run out the Estate for years while hemorrhaging administrative costs and delaying payments to claimants with presently documented claims.

Because I do not view those draconian options as clearly compelled by the statute, and because the Commissioner's plan to rely on estimations of IBNR claims is consistent with the aims underlying the Liquidation Act, I respectfully dissent.

## I

The case arises out of the collapse of Integrity Insurance Company ("Integrity"), a New Jersey Property and Casualty insurer that wrote policies in every jurisdiction. Between 1977 and 1986, Integrity issued over 25,000 commercial umbrella and excess liability insurance policies to cover extraordinary hazards

capable of generating long-tail losses that sometimes take decades to mature.[1]

Integrity's policyholders include large manufacturing companies such as American Standard, GAF Corporation, W.R. Grace, R.J. Reynolds, Union Carbide, Dow Chemical Company, and Foster Wheeler that have been the subject of mass product liability and environmental tort lawsuits. Some of those companies have been found liable for injuries that occurred as many as forty years ago, but that manifested only recently.

Asbestos claims are a good example of that liability. Various tort plaintiffs have sued policyholders based on allegations regarding the manufacture, sale, or distribution of asbestos-containing products. Unlike some other bodily injury claims, asbestos-related diseases are progressive in nature, meaning that the injury commences upon inhalation of asbestos fibers and continues while those fibers are present in the lungs ultimately manifesting as an asbestos-related disease. *Owens–Illinois, Inc. v. United Ins. Co.,* 138 *N.J.* 437, 454, 650 *A.*2d 974 (1994). Because that progressive injury continues over many years, all insurance policies in place from exposure to manifestation are triggered. *Id.* at 478–79, 650 *A.*2d 974.

The fact that policyholders may have sustained losses of which they are not yet aware, as a result of occurrences during their coverage periods, has complicated the winding down of the Integrity Estate. Closing the Estate by paying all presently reported claims would effect a forfeiture by cutting off a large number of

---

[1] Prior to liquidation, Integrity obtained reinsurance on most of its risks. Reinsurance is a "secondary level of insurance of risks" in which the reinsurer agrees to indemnify the reinsured or "cedent" against all or part of a loss that the cedent may suffer under a policy it issued. George J. Kenney & Frank A. Lattal, *New Jersey Insurance Law* § 17–2 at 559 (2d ed. 2000) (citation omitted). In turn, many of Integrity's reinsurers retroceded portions of their risks to other reinsurers known as retrocessionaires. *See id.* § 17–5 at 561 (noting retrocessionaires represent a third level of insurance of risks). Most of Integrity's reinsurance contracts provided for the payment of reinsurance to the Liquidator in the case of insolvency.

long-tail claims that have yet to emerge but with respect to which insurance was purchased. Leaving the Estate open to pay long-tail claims as they mature would increase administrative expenses by millions of dollars a year and delay final payment to parties with presently documented claims.

The Commissioner, in her role as the Estate's Liquidator, rejected both of those options. Instead, she formulated a Fourth Amended Final Dividend Plan ("FDP") that authorized her to accept actuarially estimated IBNR claims, and to pay all claims and close the Integrity Estate within three to five years. The Commissioner chose that option because it would "(1) protect the interests of claimants with contingent claims, (2) abbreviate the delay in making final payment to claimants, (3) maximize the assets of the Estate, (4) reduce administrative expenses, and (5) lighten the burden of Integrity's insolvency on … the insurance-consuming public." *In re Liquidation of Integrity Ins. Co.*, 299 *N.J.Super.* 677, 681, 691 *A.*2d 898 (Ch.Div.1996).

Under the FDP, actuarial estimation would follow well-established and commercially reasonable valuation practices that are standard in the insurance industry. *See generally* Fin. Accounting Standards Bd., *Statement of Financial Accounting Standards Board No. 60* 8–9 (1982). Insurers regularly engage in actuarial estimation in transactions ranging from the setting of reserves to takeovers, commutations, and mergers. Rebecca C. Meriwether, *The Contingent Liability Abyss: Tensions for Insurers and Reinsurers*, 22 *T. Marshall L.Rev.* 1, 1–2 (1996). In the present context, estimation involves analysis of large historical databases that reveal, among other things, the number of persons exposed to a particular toxic product, the percentage of illnesses that manifest, the percentage of claims filed, and the value of those claims. From that data, experts can estimate IBNR claims and discount the estimate to present value with some degree of precision.

Integrity's reinsurers opposed the Commissioner's plan for estimation as unauthorized under the Act. They argued that only specific individual claims for known verifiable losses are cognizable

in liquidation. After a hearing, Judge Meehan, who had overseen the liquidation since its inception, approved the FDP "[b]ased on the provisions of *N.J.S.A.* 17:30C, public policy concerns, pre-Act case law, the Federal Bankruptcy Code and case law applying its provisions, as well as the generally broad equitable authority granted to both a Liquidator and a supervising court." *In re Liquidation of Integrity Ins. Co., supra,* 299 *N.J.Super.* at 687, 691 *A.*2d 898.

The reinsurers appealed and the Appellate Division reversed, declaring estimation as unauthorized by the statute. This appeal ensued.

## II

When a court interprets a statute, abiding by the Legislature's intent is the most significant goal and generally "the best indicator of that intent is the statutory language." *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). A court therefore gives "statutory words their ordinary meaning and significance and read[s] them in context with related provisions so as to give sense to the legislation as a whole." *Ibid.* (citations omitted).

However, where the meaning of a statute is susceptible to " 'different interpretations, the court [must] consider[ ] extrinsic factors, such as the statute's purpose ... and [the] statutory context to ascertain the legislature's intent.' " *Aponte–Correa v. Allstate Ins. Co.,* 162 *N.J.* 318, 323, 744 *A.*2d 175 (2000) (quoting *Twp. of Pennsauken v. Schad,* 160 *N.J.* 156, 170, 733 *A.*2d 1159 (1999)); *see also* N. Singer, *Sutherland Statutory Construction* § 46.07 (5th ed. 1992) (finding "where different interpretations are urged, a court must look to reasons for the enactment of the statute and the purposes to be gained by it and construe the statute in the manner which is consistent with such purpose"). Simply stated, the charge is to examine *N.J.S.A.* 17:30C–28 to ensure that our reading advances the goals underlying the Act.

## III

The purpose of liquidation is "to wind up the [failed] company's affairs in the most comprehensive and efficient manner" possible. 26 *Appleman on Insurance 2d* § 162.1 (2007). "Liquidation is not just for the benefit of the insolvent insurer," but is designed "to protect creditors, policyholders, and the general public by providing comprehensive and efficient means for collecting [an] insolvent's assets and equitably paying claims of creditors." *Ibid.* (citations omitted). In furtherance of that goal, our Legislature has enacted the Rehabilitation and Liquidation Act, the scheme at issue here.

At the heart of the Act is a single mandate: "[T]hat the *broadest* protection be afforded to the public and the various claimants and beneficiaries." *In re Liquidation of Integrity Ins. Co.,* 240 *N.J.Super.* 480, 491, 573 *A.2d* 928 (App.Div.1990) (emphasis added) (citations omitted). The Commissioner, who is the Liquidator mandated by the statute, *N.J.S.A.* 17:30C–15(a), is vested with wide discretion and sole responsibility for the liquidation under the court's supervision. *Id.* at 490–91, 573 *A.2d* 928. Pursuant to *N.J.S.A.* 17:30C–4 and –5, she is authorized to apply to the court for such orders as the best interests of the policyholders, claimants and the public require, and, as may be necessary, to prevent waste of the insurer's assets. Her charge is to *"fashion any relief which 'may' be necessary"* to protect the interests of the creditors and policyholders "as well as that of 'the public.' " *Id.* at 490, 573 *A.2d* 928.

"The statutory function of the Commissioner and/or the deputy liquidator is to weigh all the interests and to perform an efficient and fair liquidation of Integrity." *In re Liquidation of Integrity Ins. Co.,* 231 *N.J.Super.* 152, 157, 555 *A.2d* 50 (Ch.Div.1988); *see also Smith v. Hunterdon County Mut. Fire Ins. Co.,* 41 *N.J.Eq.* 473, 477, 4 *A.* 652 (Ch.1886) (finding all policyholders, past and present, should share in distribution of dissolved insurance company); *In re Citizens Title Ins. and Mortgage Co.,* 127 *N.J.Eq.* 551, 554, 15 *A.2d* 57 (Ch.1940) (noting "[i]t would, however, be clearly

unjust and improper to indefinitely tie up the statutory deposit while waiting for such claims to mature. The rule of practicality and convenience requires that in cases such as this, the claims be disposed of once and for all").

In the field of insurance, the Commissioner's expertise is to be afforded great weight. *In re Assignment of Exposures to Aetna Cas. & Sur. Co.*, 248 *N.J.Super.* 367, 376, 591 *A.*2d 631 (App.Div.), *certif. denied,* 126 *N.J.* 385, 599 *A.*2d 162 (1991), *cert. denied sub nom. Allstate Ins. Co. v. Fortunato,* 502 *U.S.* 1121, 112 *S.Ct.* 1244, 117 *L.Ed.*2d 476 (1992). That deference is equally applicable to an insurance liquidation.

That is the backdrop on which the statutory language should be interpreted.

IV

The critical statutory text reads as follows:

[n]o contingent claim shall share in a distribution of the assets of an insurer which has been adjudicated to be insolvent by an order made pursuant to [*N.J.S.A.* 17:30C–30], except that such claims shall be considered, if properly presented, and may be allowed to share where

(1) Such claim becomes absolute against the insurer on or before the last day fixed for filing of proofs of claim against the assets of such insurer.

[*N.J.S.A.* 17:30C–28(a).]

My colleagues in the majority characterize that language as "clear." Focusing on the word "absolute," which, based on the dictionary, they declare to be synonymous with "unconditional" or "non-contingent," they conclude that allowing estimation of IBNR claims is not permitted. If the statute clearly barred such a procedure, I would agree. I do not agree, however, that the statute is clear on that point. Certainly, it "does not provide much guidance concerning which claims should be allowed in liquidation, nor does it define the amount of any claim that may be filed due to the premature termination of an insurance policy." *In re Liquidation of Integrity Ins. Co.,* 147 *N.J.* 128, 135, 685 *A.*2d 1286 (1996). Further, the text of *N.J.S.A.* 17:30C–28(a) does not define "contingent" or "absolute as to the insurer," and the legislative

history is silent as to the meaning and scope of those terms. *See L.* 1975, *c.* 113, § 28.

Compounding that lack of guidance is that scholars do not even agree regarding the meaning of the term "contingent claim." *Compare* Ralph E. Clark, *Contingent and Immature Claims in Receivership Proceedings,* 29 *Yale L.J.* 481 n.3 (1920) ("A simple example of a contingent claim is that of the holder of a fire insurance policy before a fire has occurred."), *with Nat'l Ass'n of Ins. Comm'rs Insurer Receivership Model Act* § 705(a)(1) (2007) ("A claim is contingent if the accident, casualty, disaster, loss, event, or occurrence insured . . . against occurred on or before the date fixed [by the Liquidator], but the act or event triggering the company's obligation to pay has not occurred as of that date."). *See also* Mary Cannon Veed, *Cutting the Gordian Knot: Long–Tail Claims in Insurance Insolvencies,* 34 *Tort & Ins. L.J.* 167, 169–70 (1998) (noting in context of IBNR claims "the liability of the insurer like the liability of the insured is unliquidated *but not contingent* from the date the events giving rise to liability occur") (emphasis added). Under some of those definitions, IBNR claims are not even contingent.

More importantly, it is evident that the Legislature never even considered IBNR claims when it enacted the Liquidation Act in 1975. As scholars have recognized, estimation of IBNR claims is "[a] new and significant issue" with respect to reinsurance in liquidation. 14 *Appleman on Insurance 2d* § 106.9 (2007). In 1975, insurance company insolvencies were infrequent and toxic tort claims had not yet pervaded the legal landscape. Indeed, the parade of insurance failures, including the insolvencies of well-known companies such as Mission, Integrity, Pine Top, Ideal, Mutual, Union Indemnity, Holland–America, and Transit, did not even occur until the mid–1980s. Veed, *supra,* 34 *Tort & Ins. L.J.* at 167–69. Likewise, toxic tort litigation with its focus on the progressive harms caused by exposure to toxic substances did not emerge full-blown in courts around the country until the 1980s and 1990s. *See* Kenneth S. Abraham, *The Maze of Mega–Coverage*

Litigation, 97 *Colum. L.Rev.* 2102, 2102–03 (1997); *see also Theer v. Philip Carey Co.,* 133 *N.J.* 610, 628 *A.*2d 724 (1993); *Mauro v. Raymark Indus., Inc.,* 116 *N.J.* 126, 561 *A.*2d 257 (1989); *Ayers v. Jackson Twp.,* 106 *N.J.* 557, 525 *A.*2d 287 (1987). It is almost certain therefore that the treatment of long-tail IBNR claims was not in the legislative cross-hairs when the Rehabilitation and Liquidation Act was passed. That is likely the reason why such claims do not fit comfortably within the contingent claim framework.

"It is frequently difficult for a draftsman of legislation to anticipate all situations and to measure his words against them. Hence cases inevitably arise in which a literal application of the language used would lead to results incompatible with the legislative design." *New Capitol Bar & Grill Corp. v. Div. of Employment Sec.,* 25 *N.J.* 155, 160, 135 *A.*2d 465 (1957). As Chief Justice Weintraub noted, in such instances

[i]t is the proper function, indeed the obligation, of the judiciary to give effect to the obvious purpose of the legislature, and to that end "words used may be expanded or limited according to the manifest reason and obvious purpose of the law. The spirit of the legislative direction prevails over the literal sense of the terms."

[*Ibid.* (quoting *Alexander v. N.J. Power & Light Co.,* 21 *N.J.* 373, 378, 122 *A.*2d 339 (1956)); *see also Smith v. Fireworks by Girone, Inc.,* 180 *N.J.* 199, 216, 850 *A.*2d 456 (2004).]

That is exactly why the Commissioner and the liquidation court refused to read the Act literally, which would have left only the options that have been approved by the majority. Neither the forfeiture of millions of dollars of purchased coverage, nor the bleeding of the Estate until all claims become certain will effectuate the goals underlying the Rehabilitation and Liquidation Act: protection of the policyholders and the public at large. Only the Commissioner's interpretation permits the broadest class of potential claimants to participate in the liquidation proceeding; husbands the assets of the Estate so that the greatest amount will be available for payment; and provides the insolvent insurer's policyholders and the public an expedient, efficient, and equitable mechanism to share in the Estate.

Because the statute is unclear insofar as IBNR claims are concerned, the Commissioner's interpretation should be deferred to in light of her broad discretion in insurance matters and more particularly, because of her wide ranging power "to fashion *any* remedy that is necessary" to protect the public and the policyholders in a liquidation.

To be sure, the Commissioner's plan is not a perfect fit with the words of the statute. However, because the statute was not drafted with IBNR claims in mind, her nuanced and creative solution was properly approved by the liquidation court as the only hope for an end to these proceedings that will best serve the interests of the policyholders and the public.[2]

V

I am hopeful that this case will prompt the Legislature to address the specific difficulties that IBNR claims present in liquidation. Jurisdictions that have more recently examined the issue have produced statutes that offer explicit direction to both the Liquidator and the courts regarding the role that estimated claims should play in the process. For instance, Missouri has adopted the following language:

> If the fixing or liquidation of any claim or claims would unduly delay the administration of the liquidation or if the administrative expense of processing and adjudication of a claim or group of claims of a similar type would be unduly excessive when compared with the moneys which are estimated to be available for distribution with respect to such claim or group of claims, the determination and allowance of such claim or claims may be made by an estimate. Any such estimate shall be based upon an actuarial evaluation made with reasonable actuarial certainty or upon another accepted method of valuing claims with reasonable certainty. [Mo. Ann. Stat. § 375.1220.2 (LexisNexis 2007); *see also* 215 Ill. Comp. Stat. Ann. 5/209(7) (LexisNexis 2007) (noting "[c]ontingent or unliquidated general creditors' and ceding insurers' claims that are not made absolute and liquidated by the last day fixed by the court ... may be determined and allowed by estimation").]

---

[2] Although the only issue before us is the validity of the Commissioner's FDP, I note that estimation of IBNR claims solely for the purpose of earmarking funds pursuant to which future absolute claims can be satisfied would not violate *N.J.S.A.* 17:30C–28(a).

Both state statutes also provide details regarding how the estimation process can be effectuated where reinsurance is involved. *See* 215 Ill. Comp. Stat. Ann. 5/209(7)(b) (LexisNexis 2007); Mo. Ann. Stat. § 375.1212 (LexisNexis 2007). Certainly some revision of the statute to specifically address IBNR claims is worthy of legislative consideration.

## VI

For the foregoing reasons, I would reverse the judgment of the Appellate Division and reinstate the order of the liquidation court approving the Commissioner's FDP.

Justice ALBIN joins in this opinion.

*For affirmance in part/vacation/remandment*—Chief Justice RABNER and Justices WALLACE and RIVERA–SOTO—3.

*For reversal*—Justices LONG and ALBIN—2.