**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3981-19

SOLVAY SPECIALITY
POLYMERS USA, LLC,

      Plaintiff-Respondent,

v.

PAULSBORO REFINING
COMPANY, LLC,

      Defendant-Appellant.

_____

Argued November 9, 2021 – Decided September 23, 2022

Before Judges Currier, DeAlmeida, and Smith.

On appeal from the Superior Court of New Jersey, Chancery Division, Gloucester County, Docket No. C-000010-20.

Thomas M. Duncan argued the cause for appellant (Manko, Gold, Katcher & Fox, LLP, attorneys; Nicole R. Moshang and Thomas M. Duncan, on the briefs).

Kegan A. Brown argued the cause for respondent (Latham & Watkins LLP, attorneys; Kegan A. Brown, on the brief).

The opinion of the court was delivered by

DeALMEIDA, J.A.D.

Defendant Paulsboro Refining Company, LLC (PRC) appeals from the June 16, 2020 order of the Chancery Division directing PRC to give plaintiff Solvay Specialty Polymers USA, LLC (Solvay) physical access to PRC's property to conduct environmental sampling pursuant to N.J.S.A. 58:10B-16. We reverse.

I.

Since 1990, Solvay has owned and operated a manufacturing plant along the Delaware River in West Deptford Township (the Solvay Facility). PRC owns and operates a refinery along the river in Greenwich Township (the PRC Property). The Solvay Facility is approximately two miles to the east and upriver from the PRC Property.

The Solvay Facility has been used to manufacture polyvinylidene fluoride (PVDF), a type of fluoropolymer, since 1985. To manufacture PVDF, a process aid is needed to create an emulsion process. From 1985 to 2010, the primary process aid used at the Solvay Facility was Surflon S-111. Surflon S-111 predominately contains ammonium perfluorononanoate, which presents as perfluorononanoic acid (PFNA) in the environment. PFNA is a specific per-

2

and polyfluoroalkyl substance (PFAS). PFAS is an umbrella term used to describe thousands of man-made chemicals that bioaccumulate, are extremely resistant to degradation, and pose a substantial threat to human health and the environment. From 1995 to 2003, Solvay also used another process aid, sodium perfluorooctanoate (NaPFO), which presents as perfluorooctanoic acid (PFOA), another specific PFAS, in the environment.

In 2009, the Delaware River Basin Commission and the Department of Environmental Protection (DEP) sampled for PFAS in various locations in southern New Jersey. In 2013, Solvay became aware of the sampling results and contacted DEP. Solvay offered to investigate possible PFAS drinking water contamination in the West Deptford area potentially attributable to the Solvay Facility.

Since that time, Solvay has investigated and remediated PFAS contamination potentially attributable to the Solvay Facility both on site and off site. Solvay has collected more than 1,000 environmental samples and spent more than $25 million to investigate and remediate PFAS contamination with the assistance of a Licensed Site Remediation Professional and DEP oversight.

In March 2019, DEP sent a Directive to Solvay asserting that it is responsible for PFAS contamination arising from the Solvay Facility.

According to the Directive, the Solvay Facility had the second highest capacity in the world for using Surflon S-111 to make PVDF and "discharged massive amounts" of PFNA into the surrounding air and water. DEP also found the Solvay Facility and surrounding area are contaminated with PFOA as a result of Solvay's activities at the site. There is nothing in the Directive suggesting contaminants from the Solvay Facility may be comingled with any release or discharge of PFAS from any other property.

The Directive seeks from Solvay, among other things, the costs DEP has incurred in conducting sampling for PFAS compounds and installing a residential drinking water treatment system in the area surrounding the Solvay Facility. DEP also seeks to have Solvay take over operation and maintenance of residential water treatment systems in several municipalities, including Greenwich Township, where the PRC Property is located. The PRC Property occupies 950 acres in the area between the Solvay Facility and most of the residential water treatment systems DEP contends should be operated and maintained by Solvay.

DEP ordered Solvay "regarding its historic use of PFNA [and] PFOA . . . in New Jersey" to "[i]dentify the nature, extent, source and location of discharges" of those compounds in the air, surface waters, groundwater, and

4

drinking water sources. The Directive ordered Solvay to sample all potable wells within 500 feet downgradient, 500 feet sidegradient, and 250 feet upgradient from each previously impacted potable well. The PRC Property is more than two miles from any potable well DEP directed Solvay to sample and the Directive does not order Solvay to investigate or remediate the PRC Property or discharges of PFAS by any entity other than Solvay.[1]

In September 2019, Solvay requested, pursuant to N.J.A.C. 7:26C-8.2, that PRC grant it access to the PRC Property to conduct environmental sampling for PFAS. PRC refused to grant access, requesting Solvay explain the basis for its belief that contamination emanating from the Solvay Facility has migrated to the PRC Property. PRC also asserted that Solvay must have a legal responsibility for remediating the PRC Property in order to gain access to the property for environmental sampling.

Solvay responded that its request for access should not be read to suggest it believed PFAS contamination from the Solvay Facility has migrated to the

[1] Solvay disputes the factual and legal basis for the Directive, but has continued its investigation and remediation of PFAS contamination in the area of the Solvay Facility. In addition to Solvay, the Directive is addressed to other parties the agency determined to be possible sources of PFAS contamination in New Jersey. Those parties are not before the court. The Directive did not identify any party other than Solvay as a possible source of PFAS contamination in the area associated with the Solvay Facility.

5

PRC Property. Instead, Solvay explained that N.J.S.A. 58:10B-16 authorizes access to the PRC Property because such access is reasonable and necessary to complete Solvay's delineation of the PFAS plume that migrated from the Solvay Facility, as ordered in the Directive. Solvay stated it had identified PFAS contamination in groundwater near the PRC Property it believes comes from sources other than the Solvay Facility and that access to the PRC Property was reasonable and necessary to determine the source of that contamination. PRC again denied Solvay's access request.

On February 12, 2020, Solvay filed a complaint and order to show cause in the Chancery Division seeking an order compelling PRC to give Solvay access to the PRC Property pursuant to N.J.S.A. 58:10B-16. Solvay alleged it needs access to the PRC Property to conduct environmental sampling in order to meet its obligations under the Directive to delineate PFAS contamination in the area of the Solvay Facility. Solvay alleged that firefighting foams containing PFNA and PFOA are commonly used at refineries and PRC used a firefighting foam at the PRC Property in 2012 to suppress odors from an oil spill. Solvay alleged both DEP and Solvay detected PFAS compounds in groundwater downgradient from the PRC Property, which may be from the 2012 use of firefighting foam. Solvay argued the statute authorizes it to access the PRC

6

Property to investigate whether PFAS contamination has migrated from the property and intermingled with PFAS contamination from the Solvay Facility downgradient from the PRC Property.

PRC opposed Solvay's application, arguing Solvay could not establish it has a statutory right to access the PRC Property. First, PRC argued that because Solvay had not been ordered by DEP to remediate the PRC Property, N.J.S.A. 58:10B-16 is inapplicable. Second, PRC noted that if the statute does apply to Solvay's application, access should not be granted because Solvay denies PFAS contamination has migrated from the Solvay Facility to the PRC Property and it is not necessary for Solvay to conduct environmental sampling on the PRC Property to comply with the Directive. Third, PRC argued Solvay's admission that it seeks access to the PRC Property to determine if PFAS contamination has migrated from the PRC Property to other properties that Solvay is required to remediate renders the statute inapplicable. PRC argued the statute was not intended as a tool for a party responsible to remediate contamination to identify other entities that might be responsible for that remediation. Fourth, PRC argued Solvay provided no evidence that PFAS had been discharged at the PRC Property or that groundwater flows from the PRC Property to the area Solvay has been directed to remediate.

A-3981-19

Finally, PRC noted that prior to issuance of the Directive, Solvay had unsuccessfully attempted to convince DEP to investigate the PRC Property as a source of PFAS contamination in the area impacted by the Solvay Facility based on the 2012 use of firefighting foam. PRC denied that the foam contained PFAS and noted that it was used in a containment tank and, after use, was pumped back into other facilities at the PRC Property. DEP, which at the time of the use of the foam stated that the event "was not expected to impact the Delaware River or local water supplies," has not determined it is reasonable or necessary to conduct PFAS sampling on the PRC Property.

On June 3, 2020, the trial court issued an oral opinion granting Solvay's application. The court rejected the argument that N.J.S.A. 58:10B-16 applies only when the party seeking access to property is obligated to remediate contamination on that property. The court instead interpreted the statute to permit access to property to investigate whether contamination has migrated from that property to other property the party seeking access is required to remediate. Thus, the court concluded Solvay is statutorily authorized to seek access to the PRC Property if Solvay can demonstrate there is a reasonable possibility that PFAS contamination migrated from the PRC Property to the area identified by DEP as contaminated by PFAS from the Solvay Facility.

The trial court found that Solvay established a reasonable possibility that PFAS contamination from the PRC Property migrated to the area that Solvay has been directed by DEP to remediate. The court based its decision on the geographic location of the PRC Property between the Solvay Facility and the contaminated area Solvay is remediating, what it described as the undisputed evidence that groundwater flows from the PRC Property to the remediation area, and PRC's admitted use of firefighting foam at the PRC Property. The court stated that PRC's use of the foam on one occasion "opens the door for the imposition of N.J.S.A. 58:10B-16" and access to the PRC Property "is to be expected . . . ." The court concluded:

> I find that if [PRC] occupies land along the Delaware River between the Solvay [F]acility and the . . . locations where the NJDEP has directed [Solvay] to be responsible for PFAS, then [Solvay] has shown a reasonable possibility of contamination, which would warrant access to the [PRC Property] for investigation and samples.
>
> I find that there is a reasonable possibility that [PRC] is a source of well water contamination based upon the facts as presented. There is a reasonable expectation of water contamination based upon the facts as presented. There is a necessity. . . . [Solvay] I find needs the samples to find out where the contamination is coming from. [I]t's not refuted that [PRC's] site was used for PFAS compounds . . . of some form in some products were used there. I find that's all that needs to be shown.

A June 16, 2020 order memorializes the trial court's decision. The order permits Solvay to enter the PRC Property, install groundwater monitoring wells, perform environmental sampling of those wells and existing wells, collect soil samples, communicate the results of testing on the samples to DEP and PRC, and other related activities. The order requires PRC to cooperate with Solvay and provide it with information concerning utilities, existing monitoring wells, and health and safety plans for the refinery.[2]

This appeal follows. PRC argues the trial court incorrectly awarded relief under N.J.S.A. 58:10B-16 because Solvay does not have an obligation to remove contamination from the PRC Property. In addition, PRC argues that if the statute applies even though Solvay does not have an obligation to remediate the PRC Property, the trial court applied the wrong provision of the statute to grant relief, made findings of fact not supported by the record, and misinterpreted the scope of Solvay's remediation requirements under the Directive. PRC argues that, as a result of these errors, the June 16, 2020 order is an unwarranted invasion of its fundamental right to exclude Solvay from its property.

---

[2] On June 23, 2020, the trial court issued an order amending certain deadlines established in the June 16, 2020 order. Those amendments are not material here.

## II.

It is well settled that the primary purpose of "statutory interpretation is to determine and 'effectuate the Legislature's intent.'" State v. Rivastineo, 447 N.J. Super. 526, 529 (App. Div. 2016) (quoting State v. Shelley, 205 N.J. 320, 323 (2011)). We start by considering "the plain 'language of the statute, giving the terms used therein their ordinary and accepted meaning.'" Ibid. (quoting Shelley, 205 N.J. at 323). Where "the Legislature's chosen words lead to one clear and unambiguous result, the interpretive process comes to a close, without the need to consider extrinsic aids." Ibid. (quoting Shelley, 205 N.J. at 323). We do "not 'rewrite a plainly-written enactment of the Legislature [or] presume that the Legislature intended something other than that expressed by way of the plain language.'" Id. at 529-30 (alteration in original) (quoting Marino v. Marino, 200 N.J. 315, 329 (2009)).

However, "[a]n enactment that is part of a larger statutory framework should not be read in isolation, but in relation to other constituent parts so that a sensible meaning may be given to the whole of the legislative scheme." Vitale v. Schering-Plough Corp., 447 N.J. Super. 98, 115 (App. Div. 2016) (quoting Wilson ex rel Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012)).

We review issues of statutory interpretation, which are questions of law, de novo. In re Liquidation of Integrity Ins. Co., 193 N.J. 86, 94 (2007) (quoting Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 549 (2002)).

The propriety of the June 16, 2020 order turns on the meaning of several statutory provisions. N.J.S.A. 58:10B-16(a)(1) provides that

> [a]ny person who undertakes the remediation of suspected or actual contamination and who requires access to conduct such remediation on real or personal property that is not owned by that person, may enter upon the property to conduct the necessary remediation if there is an agreement, in writing, between the person conducting the remediation and the owner of the property authorizing the entry onto the property. If, after good faith efforts, the person undertaking the remediation and the property owner fail to reach an agreement concerning access to the property, the person undertaking the remediation shall seek an order from the Superior Court directing the property owner to grant reasonable access to the property and the court may proceed in the action in a summary manner.

According to N.J.S.A. 58:10B-1,

> "Person" means [a] . . . corporation, company, . . . firm, or other private business entity . . . . [and]

> "Remediation" or "remediate" means all actions to investigate, clean up, or respond to any known [or] suspected . . . discharge of contaminants, including the preliminary assessment, site investigation, remedial investigation, and remedial action, or any portion thereof . . . .

12

The statute also provides that a "[r]emedial investigation"

> means a process to determine the nature and extent of a discharge of a contaminant at a site or a discharge of a contaminant that has migrated or is migrating from the site and the problems presented by a discharge, and may include . . . sampling . . . and the gathering of any other sufficient and relevant information necessary to determine the necessity for remedial action and to support the evaluation of remedial actions if necessary . . . .
>
> [N.J.S.A. 58:10B-1.]

Under the plain meaning of these provisions, Solvay is a "person who undertakes the remediation of suspected or actual contamination" for purposes of N.J.S.A. 58:10B-16(a)(1). This is so because Solvay has undertaken, first voluntarily, and later as required by the Directive, "to investigate, clean up or respond to any . . . suspected . . . discharge of contaminants" from the Solvay Facility, both on-site and in the surrounding area, and seeks to do so through "sampling" and "the gathering of any other . . . relevant information necessary to determine the necessity for remedial action . . . ." N.J.S.A. 58:10B-1.

Solvay, having failed at its good faith efforts to secure PRC's agreement to enter the PRC Property, meets the statutory definition of a party that may seek a court order granting it reasonable access to the PRC Property. We turn, then, to whether the trial court's grant of such access comports with the statute.

13

Section b of N.J.S.A. 58:10B-16 states, in relevant part:

> [t]he court shall promptly issue any access order sought pursuant to this section upon a showing that (1) a reasonable possibility exists that contamination from another site has migrated onto the owner's property, or (2) access to the property is reasonable and necessary to remediate contamination. The presence of an applicable [DEP] oversight document or a remediation obligation pursuant to law involving the property for which access is sought shall constitute prima facie evidence sufficient to support the issuance of an order.
>
> [N.J.S.A. 58:10B-16(b).]

Solvay concedes that subsection (b)(1) of the statute does not apply. Solvay denies that contamination may have migrated from the Solvay Facility to the PRC Property. It concedes the Directive does not allege PFAS migrated from the Solvay Facility to the PRC Property, require Solvay to remediate contamination on the PRC Property, or expressly direct Solvay to conduct sampling on the PRC Property for contamination from the Solvay Facility.

Solvay instead seeks access to the PRC Property to investigate whether PFAS contamination migrated from the PRC Property to the area DEP has identified as being contaminated by PFAS compounds that migrated from the Solvay Facility. According to Solvay, in order for it to comply with the Directive, it "is reasonable and necessary" to determine if PFAS compounds from the PRC Property comingled with PFAS compounds from the Solvay

14

Facility in the remediation area. Thus, Solvay seeks access to the PRC Property under subsection (b)(2) of statute.

We agree with PRC's argument that the trial court misapplied the statute to authorize Solvay to access the PRC Property. The trial court's decision is based primarily on its finding that there is a reasonable possibility that contamination migrated from the PRC Property to the area DEP directed Solvay to remediate. The statute's reasonable-possibility-of-contamination standard, however, applies to access requests under subpart (b)(1) of the statute. That provision pertains to allegations that contamination has migrated to the property to which access is sought. Solvay denies it is seeking access under this subpart of the statute.

The provision of the statute that applies to Solvay's application is subsection (b)(2): that access to the PRC Property "is reasonable and necessary to remediate contamination." N.J.S.A. 58:10B-16(b)(2). We find no support in the record of a conclusion that it is reasonable and necessary for Solvay to enter the PRC Property, install monitoring wells, take samples, and otherwise conduct environmental testing to determine the source of PFAS contaminants in the area Solvay was directed to remediate.

A-3981-19

Solvay is obligated under the Directive to "[i]dentify the nature, extent, source and location of discharges" of PFAS in the air, surface waters, groundwater, and drinking water sources as a result of "its historic use of PFNA [and] PFOA . . . in New Jersey . . . ."  (emphasis added).  While Solvay must identify the extent of the PFAS contamination that has migrated from the Solvay Facility, it is not necessary for it to identify other potential sources of PFAS contamination in the area it was directed to remediate.  Solvay can satisfy its obligation under the Directive by identifying the PFAS compounds traceable to the Solvay Facility without invading the private property of other potential sources of PFAS contamination for intrusive environmental sampling.  The Directive does not suggest any party other than Solvay is responsible for the contamination of the relevant area and does not direct Solvay to identify any other potential source of PFAS contamination.

Solvay's reliance on N.J.A.C. 7:26E-3.9 for the proposition that it is necessary for it to identify other sources of PFAS contamination in the area that is the subject of the Directive is misplaced.  That regulation provides:

> If during the site investigation, a contaminant is found in soil or ground water in excess of any remediation standard, then the person responsible for conducting the remediation may investigate the extent to which the contamination in soil or ground water is due to

16

migration to the site from an off-site source. This investigation shall be conducted by:

1. Collecting and analyzing a sufficient number of samples in appropriate locations, both horizontally and vertically, at the property boundary or off site, if needed, in order to be upgradient of any on-site area of concern to adequately determine that there is an off-site source of the contaminant;

2. Collecting and analyzing a sufficient number of samples to demonstrate a contaminant migration pathway exists from the off-site source of contamination to the area of concern; and

3. Conducting a preliminary assessment pursuant to N.J.A.C. 7:26E-3.1 and if necessary, a site investigation pursuant to N.J.A.C. 7:26E-3.3 to determine whether a source of the contaminant observed exists on site.

(b) The person responsible for conducting the remediation is not required to conduct further remediation of the contamination migrating onto the site.

[N.J.A.C. 7:26E-3.9.]

N.J.A.C. 7:26E-3.9 allows for testing to identify the possibility of off-site migration of a contaminant, not to identify the source of an off-site contaminant. Solvay did not demonstrate to the trial court that it had collected samples "at the property boundary or off site" and that it was necessary to enter the PRC Property, some two miles away, to take samples "in order to be upgradient of

any on-site area of concern to adequately determine that there is an off-site source of the contaminant . . . ." Ibid. To the contrary, Solvay identified the possibility that PFAS contamination from a source other than the Solvay Facility had migrated to the remediation area without the need to conduct environmental testing on the PRC Property.

The limited scope of N.J.A.C. 7:26E-3.9 is addressed by DEP in a technical guidance issued by the agency. In that document, DEP explained that the "term 'off-site source' pertains to the ground water contamination migrating onto the subject site, not the actual source," and that "N.J.A.C. 7:26E-3.9 does not require the investigator to document the actual location of the off-site source(s) that is causing the contamination." NJDEP, "Off-Site Source Ground Water Investigation Technical Guidance" (Sept. 2018), p. 4.[3] It is not necessary for Solvay to identify if the PRC Property is also a source of PFAS contamination in the area identified in the Directive as contaminated by the migration of PFAS from the Solvay Facility. Solvay satisfied its obligations under the Directive when it documented the possibility of PFAS contamination from a source other than the Solvay Facility.

_____

[3]https://www.nj.gov/dep/srp/guidance/srra/offsite_source_gw_investigation_guidance.pdf

A-3981-19

Where sufficient evidence of off-site contamination in a comingled plume has been documented, but the source of the contamination "has not been identified, the Department may move forward to investigate the source of the off-site discharge, if appropriate." NJDEP, "Commingled Plume Technical Guidance Document" (Mar. 2018), p. 16.[4] DEP, aware of Solvay's allegations regarding PRC's 2012 use of firefighting foam at the PRC Property, has not determined that environmental testing at the PRC Property is necessary. The Directive does not deputize Solvay with DEP's investigatory authority to investigate PRC as a source of PFAS contamination in the area identified by the agency as Solvay's responsibility to remediate. The trial court, therefore, erred when it concluded that it was reasonable and necessary for Solvay to invade PRC's property rights to investigate PFAS contamination.

We note that during the pendency of this appeal, Solvay commenced a civil action against PRC in the Law Division seeking past and future cleanup and removal costs under the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24, and a declaratory judgment as to PRC's liability related to the alleged migration of PFAS from the PRC Property to areas

---

[4] https://www.nj.gov/dep/srp/guidance/srra/commingled_plume_guidance.pdf

remediated by Solvay. Appropriate discovery with respect to the migration of PFAS from the PRC Property will be available to Solvay in that action. N.J.S.A. 58:10B-16, which is intended to facilitate reasonable and necessary remediation on private property, cannot be used as a pre-discovery tool to gather information to support a claim for contribution for the cost of remediation on other parcels.[5]

Because we conclude the trial court applied the incorrect standard when it granted Solvay's application, we need not address PRC's arguments regarding the evidentiary sufficiency of the court's finding that there is a reasonable possibility that PFAS contamination migrated from the PRC property.[6]

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5] We acknowledge the statute does not preclude a party who gains access "from initiating any subsequent civil action against the owner of the property upon which access was ordered." N.J.S.A. 58:10B-16(e). We do not view this provision as an endorsement of the use of the statute as a pre-discovery information gathering tool.

[6] After briefing was complete in this matter, the United States Supreme Court issued its opinion in Cedar Point Nursery v. Hassid, ___ U.S. ___, 114 S. Ct. 2063 (2021). In that case, the Court held that a California regulation that granted labor organizations a right of access to private property in order to solicit support of unionization was an unconstitutional per se physical taking under the Fifth and Fourteenth Amendments. Id. at 2072. We offer no opinion with respect to whether a grant of access to a private party to conduct environmental sampling under N.J.S.A. 58:10B-16 would constitute a per se unconstitutional physical taking under the holding in Cedar Point.

A-3981-19